TORRUELLA, Circuit Judge.
The United States government attempted to recover $7 million in drug proceeds that a Massachusetts resident deposited in an Antiguan bank and then forfeited to the United States as part of a plea agreement. After the bank did not turn over the funds, the United States filed a claim in the Massachusetts District Court for conversion, unjust enrichment, and breach of contract against Swiss American Bank and its alleged alter ego, Bank of New York-Inter-Maritime Bank. For the second time, the government appeals the court’s dismissal of the case for lack of personal jurisdiction and its refusal to allow jurisdictional discovery. After completing a plenary review, we agree with the district court that the government failed to make a prima facie showing of specific or general jurisdiction, and conclude that the district court acted within its discretion to deny the government jurisdictional discovery. We therefore affirm the judgment.
I.
Between 1985 and 1987, John E. Fitzgerald, a resident of Massachusetts, deposited about $7 million in Swiss American Bank and Swiss American National Bank *616 (collectively SAB), both organized under the laws of Antigua and Barbuda and located there. Fitzgerald deposited the money in accounts held in the name of shell corporations.[1] When he made the deposits, SAB was the wholly owned subsidiary of Swiss American Holding Company,[2] a Panamanian corporation, which in turn was wholly owned by Bank of New York-Inter-Maritime Bank (IMB), an institution organized under Swiss law and based in Geneva.
In 1993, Fitzgerald pled guilty to several counts of conspiracy for racketeering and attempted money laundering. He admitted that the funds deposited at SAB were drug proceeds that he had laundered through shell corporations organized with the help of Peter F. Herrington, then SAB’s general manager. During some of the time that Fitzgerald deposited his money at SAB, his funds represented about one-third of the bank’s total deposits. As part of his plea agreement, Fitzgerald agreed to forfeit the money in his SAB accounts to the United States government.
In November 1993, the U.S. District Court for the District of Massachusetts entered a preliminary order of forfeiture regarding the deposited funds. Beginning in January 1994, the United States made a series of requests to the Antiguan government seeking assistance in recovering the money. Meanwhile, notice of the impending forfeiture was published in the Anti-guan Gazette and the Boston Globe. No competing claims were filed. However, on March 28, 1994, during the filing period, SAB sent a letter to the district court that stated:
[I]n the event of your action for forfeiture being successful, the banks have been instructed by the Government of Antigua and Barbuda to freeze all of the assets ... in issue in your Petition, until the ultimate beneficial owners have been ascertained to the Government’s satisfaction. This is a directive that the banks have to honor on pain of having their licences revoked and is a problem that you may well have to address on the successful conclusion of your litigation.
On May 4, 1994, the district court entered a final order decreeing the money in Fitzgerald’s SAB account to be forfeited to the United States. In a November 13, 1995 letter, the Solicitor General of Antigua informed the United States that the bank records of Fitzgerald’s account had been destroyed in a September 1995 hurricane and that the funds had been frozen by the Antiguan government. On November 20, 1995, the United States learned from a lawyer for Antigua that the SAB funds were “no longer available” because they had been transferred to the Antiguan government and used to pay off debts. It is undisputed that in either December 1994 or January 1995, after the final order of forfeiture was entered, SAB transferred $5 million from Fitzgerald’s account to the Antiguan government and kept the remaining $2 million, apparently to pay off loans taken out by Fitzgerald. SAB and the Antiguan government agree that the funds were disbursed with the Antiguan government’s approval.
On December 23, 1997, the United States filed a complaint in federal district court in Massachusetts suing SAB and *617 1MB for conversion, unjust enrichment, and breach of contract. On September 30, 1998, the district court dismissed the government's case for lack of personal jurisdiction. See United States v. Swiss Am. Bank, Ltd., 23 F.Supp.2d 130 (D.Mass.1998) (Swiss I). The court ruled that the government failed to show that the defendants were beyond the jurisdictional reach of any state court of general jurisdiction, as required by Federal Rule of Civil Procedure 4(k)(2). Id. at 136. The court also denied the government's request for discovery because of its failure to plead this element of personal jurisdiction. Id.
The government appealed, and we reversed the district court's dismissal for lack of jurisdiction under Rule 4(k)(2). See United States v. Swiss Am. Bank, Ltd., 191 F.3d 30 (1st Cir.1999) (Swiss II). We said that three elements are required for the exercise of personal jurisdiction under Rule 4(k)(2): (1) the plaintiffs claim must arise under federal law; (2) the defendant must be beyond the jurisdictional reach of any state court of general jurisdiction (the "negation requirement"); and (3) the exercise of jurisdiction must not violate the defendant's rights under the Constitution or federal law. See id. at 38-39. We found that the government had satisfied the first element of this test, and directed the district court to apply a new burden-shifting framework to the negation requirement. See id. at 41. We also directed the court to reconsider the government's request for discovery in light of the new negation requirement analysis that we set forth. See id. at 46. Finally, we declined to rule on IMB's argument that the case against it should be dismissed on the merits, saying that this matter should await resolution of the jurisdictional issue. See id. at 46-47.
On remand, SAB and 1MB renewed their motions to dismiss, and the government subsequently renewed its request for discovery. The district court held a hearing on these motions on March 30, 2000. The court's review included affidavits and related evidence submitted by both parties, including a report from the government's investigator, as well as the allegations contained in the pleadings. At the hearing, the court granted IMB's motion to dismiss for failure to adequately plead alter ego liability Wand for lack of personal jurisdiction. See United States v. Swiss Am. Bank, Ltd., 116 F.Supp.2d 217, (D.Mass.2000) (Swiss III). Following the hearing, the court issued a written opinion dismissing the case against SAB for lack of personal jurisdiction. See id. at 225. Applying the burden-shifting framework set forth in Swiss II, the court found that the defendants had conceded the negation requirement. Id. at 220. It then turned to the third element under Rule 4(k)(2): whether jurisdiction would violate constitutional due process because the defendants lacked adequate contacts with the United States as a whole and because the exercise of jurisdiction would be unreasonable. Id. The court found that the government failed to show sufficient contacts under either a general or specific theory of personal jurisdiction. Id. at 222-25. Finding that the government's jurisdictional showing was "bootless" and did not amount to a cOlorable claim, the court also denied the request for jurisdictional discovery. Id. at 225.
II.
It is basic law that a court must have personal jurisdiction over the parties to hear a case, "that is, the power to require the parties to obey its decrees." Swiss II, 191 F.3d at 35. At the same time, "[d]etermining personal jurisdiction has always been more an art than a science." Donatelli v. Nat'l Hockey League, 893 F.2d 459, 468 n. 7 (1st Cir.1990). As Justice Marshall said, the jurisdictional de *618 termination “is one in which few answers will be written in black and white. The greys are dominant and even among them the shades are innumerable.” Id. (quoting Kulko v.Super. Ct., 436 U.S. 84, 92, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978)) (internal quotation marks and citations omitted).
The personal jurisdiction inquiry in federal question cases like this one differs from the inquiry in diversity cases. See 28 U.S.C. § 1332. Here, “the constitutional limits of the court’s personal jurisdiction are fixed ... not by the Fourteenth Amendment but by the Due Process Clause of the Fifth Amendment.” United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1085 (1st Cir.1992) (Pleasant St. I). This distinction matters because under the Fifth Amendment, a plaintiff need only show that the defendant has adequate contacts with the United States as a whole, rather than with a particular state. See id. At the same time, however, the plaintiff must still ground its service of process in a federal statute or civil rule. See id. In this case, the government’s asserted basis for jurisdiction is Federal Rule of Civil Procedure 4(k)(2).[3] The Rule functions “as a species of federal long-arm statute” by “elos[ing] [the] loophole” that existed when foreign defendants “lacked single-state contacts sufficient to bring them within the reach of a given state’s long-arm statute,” but “had enough contacts with the United States as a whole to make personal jurisdiction over them in a United States court constitutional.” Swiss II, 191 F.3d at 40. Whereas state long-arm statutes require a showing that the parties have sufficient contacts with the forum state, Rule 4(k)(2) requires a showing that the parties have sufficient contacts with the United States as a whole.
“A district court may exercise authority over a defendant by virtue of either general or specific jurisdiction.” Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass’n, 142 F.3d 26, 34 (1st Cir.1998). “Specific jurisdiction exists when there is a demonstrable nexus between a plaintiffs claims and a defendant’s forum-based activities.” Id. “General jurisdiction exists when the litigation is not directly founded on the defendant’s forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state.” Pleasant St. I, 960 F.2d at 1088. Here the government argues that it has met the tests for both general and specific jurisdiction. In the alternative, the government contends that if its jurisdictional showing fell short, the district court should have allowed it to take limited discovery of SAB’s contacts with the United States as a whole.
When a district court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, as in this case, the “prima facie” standard governs its determination. See United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 987 F.2d 39, 43 (1st Cir.1993) (Pleasant St. II); Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir.1992). “Under this standard, it is plaintiffs burden to demonstrate the existence of every fact required to satisfy both the forum’s long-arm statute and the Due Process Clause of the Constitution.” Pleasant St. II, 987 F.2d at 44 (internal *619 quotation marks omitted). “The prima fa-cie showing must be based upon evidence of specific facts set forth in the record.” Id. To meet this requirement, the plaintiff must “go beyond the pleadings and make affirmative proof.” Id. (internal quotation marks omitted). However, in evaluating whether the prima facie standard has been satisfied, “the district court is not acting as a factfinder; rather, it accepts properly supported proffers of evidence by a plaintiff as true and makes its ruling as a matter of law.” Id. When “the district court employs the prima facie standard ... appellate review is de novo.” Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 147 (1st Cir.1995).
A. General Jurisdiction
The government argues that it has demonstrated sufficient contacts to make a prima facie showing of general jurisdiction. In evaluating whether the exercise of personal jurisdiction is warranted, courts concentrate on the “quality and quantity of contacts between the potential defendant and the forum.” Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir.1999). The assertion of general jurisdiction comports with due process when two criteria are met. First, there must be “continuous and systematic general business contacts” between the foreign defendant and the forum. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Second, the plaintiff must show that the exercise of jurisdiction would be reasonable. See Donatelli, 893 F.2d at 465 (discussing the five “gestalt factors” used to determine fundamental fairness of exercising jurisdiction). As a threshold matter, “[t]he standard for evaluating whether these contacts satisfy the constitutional general jurisdiction test is considerably more stringent than that applied to specific jurisdiction questions.” Noonan v. Winston Co., 135 F.3d 85, 93 (1st Cir.1998) (internal quotation marks omitted).
We start with the defendant’s contacts with the forum because “[i]f the same do not exist in sufficient abundance ... the inquiry ends.” Donatelli, 893 F.2d at 465. The district court found that the contacts discovered by the government’s investigator, and taken as true for purposes of the motion to dismiss, were as follows: (1) in 1992 and 1993 SAB placed twelve advertisements in American Way magazine, a publication of American Airlines; (2) during an unspecified period, SAB subscribed to Visa International, a California credit card company, and entered into a licensing agreement with MasterCard International, a New York company; (3) in 1990, SAB was an appellant in a lawsuit in a Florida court; (4) in 1998, information about SAB was posted on three internet sites;[4] (5) in 1996, SAB entered into a contract with Arkansas Systems, Inc., an Arkansas company, for the provision of ATM support services; (6) sometime before 1985, SAB entered into a joint venture with Home State Savings Bank of Ohio; (7) in 1996, SAB loaned $350,000 to a Colorado company that runs an internet service called Sportspiks; (8) in 1996, SAB “may have” had business relations with Nhancement Technologies, Inc., a California company; (9) SAB “had correspondent banking relationships and accounts” with four New York banks; and (10) SAB had a business relationship with Fitzgerald. See Swiss III, 116 F.Supp.2d at 221-22.
*620 The government concedes that SAB has no office, personnel, or telephone number in the United States, but nevertheless argues that the contacts described above are continuous and systematic when considered “in the aggregate.” Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 204 (1st Cir.1994). The government contends that the contacts show that “SAB conducts business in the United States without the need for a physical presence,” and that “[a]s the banking universe expands to include Internet banking and correspondent bank relationships as routine, so too must the bases under which internationally active banks are held accountable by the jurisdictions in which they have customers and conduct business.”
Compelling as this argument may be in some respects, it fails the legal test for “continuous and systematic” contacts. In determining what constitutes “continuous and systematic” contacts, our analysis is “a fact-specific evaluation” of the defendant’s contacts with the forum. Noonan, 135 F.3d at 93. For guidance in this factual inquiry, we look to “the types of contacts deemed sufficiently continuous and systematic in other cases.” Id.
As the district court correctly pointed out, SAB’s contacts with the United States are less continuous and systematic than contacts found to be insufficient for general jurisdiction in previous cases. See Swiss III, 116 F.Supp.2d at 224-25. In Helicopteros, the Supreme Court found that a Texas district court could not exercise jurisdiction over a Colombian corporation that sent its chief executive officer to Houston for contract negotiations; accepted into its New York bank accounts checks drawn on a Houston bank; bought equipment and training services from a Texas corporation; and sent personnel to that corporation’s Texas facilities for training. 466 U.S. at 416, 104 S.Ct. 1868.
Similarly, in Noonan, we found that the Massachusetts district court could not exercise jurisdiction over a British company that sent an employee to Massachusetts to photograph the plaintiff, directly solicited business from a Massachusetts company, and received $585,000 in orders from that same company. 135 F.3d at 93. In Dona-telli, we said that no jurisdiction attached in Rhode Island over the National Hockey League, which for ten years provided league officials at exhibition games, telecast games into Rhode Island, and sold products with the National Hockey League logo. 893 F.2d at 470-71. In Glater, the defendant Indiana corporation employed eight sales representatives in New Hampshire, conducted business in the state, and advertised in trade journals that circulated there. 744 F.2d at 215. We said that “these vestigial contacts” did not suffice for the exercise of jurisdiction. Id. at 217.
In short, the government has not shown that SAB’s limited and intermittent contacts with the United States rise to the level of what we have previously understood as “continuous and systematic.” As a result, the government has not made the prima facie showing needed for the exercise of general personal jurisdiction.
B. Specific Jurisdiction
The government asserts that even if it has not shown contacts sufficient to satisfy the “continuous and systematic” threshold for general jurisdiction, it has nevertheless proved individual contacts with the forum sufficient for the exercise of specific jurisdiction. Determining whether the plaintiff has alleged sufficient facts for a finding of specific jurisdiction requires a three-part analysis. Phillips Exeter, 196 F.3d at 288.
First, an inquiring court must ask whether the claim that undergirds the litigation directly relates to or arises out *621 of the defendant’s contacts with the forum. Second, the court must ask whether those contacts constitute purposeful availment of the benefits and protections afforded by the forum’s laws. Third, if the proponent’s case clears the first two hurdles, the court then must analyze the overall reasonableness of an exercise of jurisdiction in light of a variety of pertinent factors that touch upon the fundamental fairness of an exercise of jurisdiction.
We begin with the question of whether the government made a prima facie showing that its claims were directly related to or arose out of SAB’s contacts with the United States.
“The requirement that a suit arise out of, or be related to, the defendant’s in-forum activities comprises the least developed prong of the due process inquiry.” Ticketmaster-N.Y, 26 F.3d at 206. “We know to a certainty only that the requirement focuses on the nexus between defendant’s contacts and the plaintiffs cause of action.” Id.; accord Sawtelle v. Farrell, 70 F.3d 1381, 1389 (1st Cir.1995). We begin by identifying the alleged contacts, since there can be no requisite nexus between the contacts and the cause of action no contacts exist. Cf. Sawtelle, 70 F.3d at 1389 (stating that the defendant’s contacts are central to each prong of the tripartite analysis).
this case, the government essentially alleges two relatedness contacts between SAB and the United States. First, the government asserts that the contractual relationship between SAB and Fitzgerald (or the United States, as Fitzgerald’s successor in interest) constitutes a contact, one which was overlooked by the district court. Second, the government claims that the injurious effects of the alleged conversion were felt in the United States, and thus constitute a contact with the forum. The government does not allege any other related contacts with the forum, such as telephone calls, mail, or physical presence.
We turn first to the alleged contact based on the relationship between Fitzgerald and SAB. The flaw in the government’s argument is that SAB’s business relationship and/or contract with Fitzgerald, however, is not itself a contact with the United States as a forum. See Saw-telle, 70 F.3d at 1389 (stating that the relatedness requirement is not met by a cause of action that arises out of a general relationship between the parties, but rather, that the action must arise out of specific contacts between the defendant and the forum). A contract is “but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.” Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (internal quotations omitted). A contract, by itself, cannot automatically establish minimum contacts. Id. at 478, 105 S.Ct. 2174. Rather, Burger King developed what we have described as a “ ‘contract-plus’ analysis.” Ganis Corp. v. Jackson, 822 F.2d 194, 197-98 (1st Cir.1987). Thus, “prior negotiations and contemplated future consequences, along with ... the parties’ actual course of dealing ... must be evaluated in determining whether the defendant” has minimum contacts with the forum. Burger King, 471 U.S. at 479, 105 S.Ct. 2174 (finding that franchise contract, which envisioned a twenty-year relationship and continuing contacts with the forum, constituted a contact for purposes of due process analysis).
The government concedes that there is no evidence that Herrington or any other SAB representative went to the United States in connection with Fitzgerald’s accounts. SAB’s lack of a physical *622 presence in the United States, however, is not fatal to the case for jurisdiction. See Burger King, 471 U.S. at 476, 105 S.Ct. 2174 (“Jurisdiction in these circumstances may not be avoided merely because the defendant did not physically enter the forum State.”); Pritzker v. Yari, 42 F.3d 53, 62 (1st Cir.1994) (“a non-resident defendant may not always be able to elude the net by such simple expedients as remaining physically outside the forum”). When physical presence is lacking, we look for some other indication that the defendant reached into the forum, such as mail or telephone contacts. See Burger King, 471 U.S. at 476, 105 S.Ct. 2174; Mass. Sch. of Law, 142 F.3d at 36. The government has no such evidence here. For example, the record does not show that the bank called or wrote to Fitzgerald to solicit him as a customer or to manage his account.[5] Cf. Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 716-17 (1st Cir.1996) (defendant’s correspondence soliciting business from plaintiff satisfied minimal contacts requirement). Instead, the evidence shows that Fitzgerald opened the SAB accounts in Antigua and that most of the $7 million came not directly from the United States, but from “other foreign locations.” Swiss II, 191 F.2d at 38.
Although the government does not specifically argue the point, SAB’s March 28, 1994 letter to the Massachusetts district court informing it that the Antiguan government had frozen Fitzgerald’s accounts is also a jurisdictional contact. See Sawtelle, 70 F.3d at 1389-90 (letter and call made to forum by defendant in malpractice case were “unquestionably a contact for purposes of our analysis”). The letter was not a related contact for purposes of the government’s claim, however, because the letter was not essential to either the formation or breach of the alleged contract between SAB and the government. See Phillips Exeter, 196 F.3d at 289 (stating that a contact is related for purposes of a contract claim when the contact is “instrumental either in the formation of the contract or in its breach”). Rather, the letter simply gave notice that payment might not occur, so, at most, it can be considered only marginally instrumental to the alleged breach.
In sum, having examined the business relationship between SAB and Fitzgerald and/or the United States, which involves no in-forum activities, we find that the government has not satisfied Burger King’s “contract-plus” requirement, see 471 U.S. at 478-79, 105 S.Ct. 2174, to demonstrate that this relationship is in fact a contact with the forum for the purposes of the relatedness inquiry.
We now turn to the government’s argument that the effects of the injuries caused by SAB’s activities qualify as related contacts. The relatedness inquiry for tort claims focuses on whether the defendant’s in-forum conduct caused the injury or gave rise to the cause of action. Mass. Sch. of Law, 142 F.3d at 35. The government asserts that SAB’s role in advising Fitzgerald on laundering $7 million in drug proceeds through an account in Antigua and the bank’s subsequent disbursement of those funds caused wrongful effects — the loss of the money to the United States government — which were felt in the United States. Because SAB refused to tender the allegedly converted funds, and the effects of this injury were felt in the United States, the government opines *623 that these in-forum effects are contacts that satisfy the relatedness element.
Because the government can point to no in-forum activities by SAB that relate to its claim, the government attempts to bolster its case for specific jurisdiction by relying on the in-forum “effects” theory inaugurated in Calder v. Jones, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). In that case, two newspapermen from Florida who were working for the National Enquirer wrote an allegedly libelous article about a California entertainer. Id. at 784-85, 104 S.Ct. 1482. The article was primarily based on phone calls to California sources. Id. at 785, 104 S.Ct. 1482. However, Colder did not turn on the presence of physical, mail, or telephone contacts between the defendants and the forum. Id. at 787 n. 6, 104 S.Ct. 1482. Instead, the Supreme Court held that California could assert personal jurisdiction over the newspapermen “based on the ‘effects’ of [defendants’] Florida conduct in California.” Id. at 789, 104 S.Ct. 1482.
Unfortunately for the government, though, in this case, Colder cannot carry the day. Calder “cannot stand for the broad proposition that a foreign act with foreseeable effects in the forum state always gives rise to specific jurisdiction.” Bancroft & Masters, Inc. v. Augusta Nat’l Inc., 223 F.3d 1082, 1087 (9th Cir.2000). Colder is inapposite to this case for a number of reasons.
First, we have previously recognized that Colder’s “effects” test was adopted “for determining purposeful availment in the context of defamation eases.” Noonan, 135 F.3d at 90 (emphasis added). Thus, the “effects” test is a gauge for purposeful availment and is to be applied only after the relatedness prong has already been satisfied. Although “there is a natural blurring of the relatedness and purposeful availment inquiries in cases (like this one) in which the alleged contacts are less tangible than physical presence[,] ... the inquiries are different....” Phillips Exeter, 196 F.3d at 289. The purposes behind each prong bring this difference into focus.
The relatedness inquiry separates general jurisdiction from specific jurisdiction cases. Ticketmaster-N.Y., 26 F.3d at 206. When alleged contacts fall short of being “continuous and systematic” so that the exercise of general jurisdiction would be unfair, those contacts may still support the exercise of specific jurisdiction if they are related to the cause of action. Phillips Exeter, 196 F.3d at 288. The relatedness prong ensures fundamental fairness by protecting a defendant from being hauled into an out-of-state forum based on a single contact with that forum that is wholly unrelated to the suit at issue. See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291-92, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (noting that due process protects a defendant from inconvenient forums and prevents states from overreaching the boundaries of their sovereignty); Phillips Exeter, 196 F.3d at 287-88 (stating that due process protects those whose extra-forum activities do not make personal jurisdiction in the forum foreseeable). When the nexus between the forum contacts and the cause of action is too attenuated, it violates fundamental fairness to force a defendant with noncontinuous or non-systematic contacts to defend himself in that forum. Mass. Sch. of Law, 142 F.3d at 36 (arguing that a letter from A to B, reporting on C’s actions, cannot confer personal jurisdiction over C in B’s home state because the connection between B’s state and C’s extra-forum activities is too attenuated).
The purposeful availment inquiry, though, focuses on the defendant’s intentionality. See Noonan, 135 F.3d at 90-91 (discussing Colder’s intent requirement *624 for purposeful availment). This prong is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court’s jurisdiction based on these contacts. See Phillips Exeter, 196 F.3d at 292; Ticketmaster-N.Y., 26 F.3d at 207-208.
Calder addressed purposeful availment, rather than relatedness. See Noonan, 135 F.3d at 90 (discussing the intent of the defendants in Calder by aiming their article at the forum state). Calder focused on the defendants’ intent to cause injury in the forum by aiming their article at a forum resident and then publishing the article there, knowing that the injury would be felt in the forum. 465 U.S. at 789-90, 104 S.Ct. 1482. The only contacts between one of the Calder defendants[6] and the forum were that his article was published within the forum and the legal injury occurred within the forum. Calder, 465 U.S. at 786, 790, 104 S.Ct. 1482; see also Keeton, 465 U.S. at 777, 104 S.Ct. 1473 (noting that the legal injury of libel occurs “wherever the offending material is circulated”). Both the in-forum publication and the in-forum injury were clearly related to the plaintiffs defamation suit, so the Supreme Court did not need to address the relatedness prong before proceeding to the purposeful availment inquiry. Thus, since Calder’s “effects” test is relevant only to the purposeful availment prong, it cannot be used to strengthen the government’s relatedness showing.
Second, courts “have struggled somewhat with Calder’s import.” Bancroft & Masters, 223 F.3d at 1087.[7] As we have previously noted, Calder’s “effects” test was specifically designed for use in a defamation case. Noonan, 135 F.3d at 90 (citing Calder as having “adopted an effects test for determining purposeful availment in the context of defamation cases”). Thus, whether Calder was ever intended to apply to numerous other torts, such as conversion or breach of contract, is unclear. See IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 261 (3d Cir.1998) (noting that courts, in applying Calder to non-defamation cases, have adopted “a mixture of broad and narrow interpretations”); McGlinchy v. Shell Chemical Co., 845 F.2d 802, 817 (9th Cir.1988) (refusing to apply “effects” test to contract claim).
Third, the facts of Calder diverge widely from the facts in this case. Although Calder’s significance is based on its “effects” theory, in that case, the actual tort or injury, not just its consequences, occurred within the forum. Compare Keeton v. Hustler Magazine, 465 U.S. 770, 776-77, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) (tort of libel is generally held to occur wherever the libelous material is circulated), with Swiss II, 191 F.3d at 37 (legal injury of conversion occurs where conversion takes place). Moreover, the in-forum publication *625 of the article in Colder provided an important contact for jurisdictional purposes; a contact that is absent in this case, since any tortious conversion or breach of contract occurred in Antigua.
Fourth, our Calder-based precedent dictates that the government’s “effects” argument is insufficient here to show relatedness. “We have wrestled before with this issue of whether the in-forum effects of extra-forum activities suffice to constitute minimum contacts and have found in the negative.” Mass. Sch. of Law, 142 F.3d at 36; accord Sawtelle, 70 F.3d at 1390-91 (relatedness showing was “tenuous at best” when based on “effects” of defendants’ malpractice, committed outside of forum, and on ancillary legal advice mailed into the forum); Kowalski v. Doherty, Wallace, Pillsbury & Murphy, 787 F.2d 7, 11 (1st Cir.1986) (finding that “effects” in the forum are not equivalent to an actual injury caused in the forum by in-forum activities).
The district court, based on the government’s mere showing of in-forum effects, rather than actual contacts or injury within the forum, found the government’s relatedness showing so “scant” that it did not consider the purposeful availment or reasonableness elements of the tripartite jurisdictional analysis. Swiss III, 116 F.Supp.2d at 222. We are likewise underwhelmed by the government’s relatedness showing. Thus, our jurisdictional analysis need proceed no further. Since the government has failed to satisfy the first prong of the jurisdictional test, its argument for specific jurisdiction must fail.
C. Jurisdictional Discovery
In the alternative, the government requests discovery to develop additional facts. The government asked for discovery in the initial proceedings before the district court, but the court denied the motion. In Swiss II, we vacated the denial and directed the district court to reevaluate the government’s request because the burden-shifting framework for the negation requirement that we laid out “undermine[d] the rationale for the district court’s decision.” 191 F.3d at 46. We noted that under our precedents, “[a] timely and properly supported request for jurisdictional discovery merits solicitous attention.” Id. at 45.
On remand, the district court heard argument about the government’s request for jurisdictional discovery. In Swiss III, the court denied the government’s request. Considering only the relatedness element of the test for specific jurisdiction, the court said that “the government, while asserting that it has stated a ‘colorable case’ in satisfaction of the minimum contacts requirement for specific personal jurisdiction, offers scant evidence in support of that conclusion.” 116 F.Supp.2d at 222. The court concluded: “Indeed, so bootless ... is the government’s showing here in light of the applicable authority, that it has made no colorable claim sufficient to entitle it to any further discovery.” Id. at 225 (citation and internal quotation marks omitted).
We have long held that “a diligent plaintiff who sues an out-of-state corporation and who makes out a colorable case for the existence of in personam jurisdiction may well be entitled to a modicum of jurisdictional discovery if the corporation interposes a jurisdictional defense.” Sunview Condominium Ass’n v. Flexel Int’l, Ltd., 116 F.3d 962, 964 (1st Cir.1997) (emphasis added); accord Surpitski v. Hughes-Keenan Corp., 362 F.2d 254, 255-56 (1st Cir.1966). However, “that entitlement is not absolute.” Sunview, 116 F.3d at 964. A plaintiff must be diligent in preserving his or her rights. Id. Moreover, even when the plaintiff has been diligent and has made a colorable claim for *626 personal jurisdiction, the district court still has “broad discretion to decide whether discovery is required.” Crocker v. Hilton Int'l Barb., Ltd., 976 F.2d 797, 801 (1st Cir.1992).
The standard for reversing a district court’s decision to disallow jurisdictional discovery is high. Given the trial court’s broad discretion in determining whether to grant jurisdictional discovery, “[a] ruling will be overturned only upon a clear showing of manifest injustice, that is, where the lower court’s discovery order was plainly wrong and resulted in substantial prejudice to the aggrieved party.” Crocker, 976 F.2d at 801 (internal quotation marks omitted) (emphasis added); see also Noonan, 135 F.3d at 94.
In this case, the government has been unable to show that the district court’s denial of discovery was “plainly wrong” and an abuse of discretion. Even if this Court disagreed with the district court’s assessment that the government’s jurisdictional showing was “bootless,” Swiss III, 116 F.Supp.2d at 225, such disagreement is an insufficient basis for overturning the district court’s decision. In order to reverse the district court, we would have to find that its analysis was “plainly wrong and resulted in substantial prejudice.” Crocker, 976 F.2d at 801. We can make no such finding here.
After our analysis of the government’s argument, it is unclear that the government has presented what amounts to a “colorable” claim for personal jurisdiction. As discussed above, the government’s relatedness showing was unconvincing. And, in order to find specific personal jurisdiction, all three prongs of the tripartite test must be satisfied. Phillips Exeter, 196 F.3d at 289. Moreover, if the plaintiff fails to make a strong showing with respect to the first two prongs, then the exercise of personal jurisdiction is more likely to be found unreasonable under the third prong. Id. at 288 n. 1. Thus, even if this Court were ruling afresh (rather than under a restricted standard of review) on the jurisdictional discovery issue, it is not clear that discovery would be warranted. As a result, we can hardly state that the district court was “plainly wrong” in denying discovery for lack of a colorable claim.
We have also held that, in addition to presenting a colorable claim, a plaintiff must be diligent in preserving his rights to be entitled to jurisdictional discovery. Sunview, 116 F.3d at 964. This includes the obligation to present facts to the court which show why jurisdiction would be found if discovery were permitted. See Barrett v. Lombardi, 239 F.3d 23, 26 (1st Cir.2001). The government, here, has been less than diligent. As SAB points out, only on appeal did the government flesh out its description of the types of contacts it hopes to discover: (1) “the origins and nature of SAB’s relations and contacts with Fitzgerald;” (2) “business meetings that took place in the United States, or were conducted by telephone, with persons in the United States, relating to the subject accounts;” (3) “information that might have been sent by mail or other means” by SAB to the United States; and (4) the “origin and nature of any other business relations” between SAB and American account holders or business partners. The government should have given the district court this more detailed description of the “additional pertinent avenues of inquiry” that it hoped to pursue. Whittaker Corp. v. United Aircraft Corp., 482 F.2d 1079, 1086 (1st Cir.1973). Because the government did not present these specifics below, they do not enter into our analysis of whether the court abused its discretion in denying the request for discovery. Failure to allege specific contacts, relevant to establishing personal jurisdiction, in a jurisdic *627 tional discovery request can be fatal to that request. See Crocker, 976 F.2d at 801 (denying discovery where appellants sought information, irrelevant to forum contacts, on solicitation of business and the provision of goods or services outside of the forum); Noonan, 135 F.3d at 94 (denying discovery where plaintiffs sought information about the interrelationships among the defendants; information irrelevant to purposeful availment).
Given the overall unpersuasive ease for personal jurisdiction, the government’s failure to allege specific contacts it was seeking to discover, and the wide discretion given to the district court, we cannot conclude, in light of our precedent, that the district court was “plainly wrong” in denying discovery.
III.
In its complaint, the government alleged that IMB is SAB’s alter ego. At the March 30, 2000 hearing on SAB’s and IMB’s motions to dismiss, the district court dismissed the government’s case against IMB “for failure adequately to plead allegations of alter ego liability and for lack of personal jurisdiction.” Swiss III, 116 F.Supp.2d at 219. On appeal, the government challenges this ruling. In the alternative, it contends that it should have been allowed to take discovery about IMB’s relationship with SAB, arguing, as it did below, that discovery is needed because “the defendants exclusively hold the critical information that would explain the events surrounding the disappearance of the funds.”
In Stuiss II, IMB argued that it could not be held hable for SAB’s alleged misconduct because it was not SAB’s alter ego. We said that this argument was “premature” because it involved “reaching the merits of a case,” which, according to Supreme Court precedent, “should await a determination of the district court’s jurisdiction over IMB.” 191 F.3d at 46. We noted “[t]he lack of a developed record and the fact that the district court has not yet expressed its views on this motion” as added reason to decline to address IMB’s argument on the merits. Id. The jurisdictional question over IMB can now be resolved, in light of this Court’s decision affirming the lack of personal jurisdiction over SAB.
The government concedes that personal jurisdiction extends to IMB only if (1) the government makes a prima facie case for jurisdiction over SAB and if (2) the government can establish alter ego liability. See Pleasant St. I, 960 F.2d at 1091 (“if [subsidiary] PSC’s contacts can be attributed to [parent company] ITD, then the jurisdictional hurdle can be vaulted”); Donatelli, 893 F.2d at 466 (“Since the essence of personal jurisdiction is to bring responsible parties before the court, a corporation which is actually responsible for its subsidiary’s decision to undertake instate activities should, in all fairness, be within the state court’s jurisdictional reach.”). Since the government was unable to make the case for jurisdiction over SAB, the first “if’ has not been satisfied. Therefore, personal jurisdiction cannot extend to IMB. We thus affirm the district court’s dismissal of the case against IMB.
IY.
For the foregoing reasons, we agree with the district court’s dismissal of the case against SAB and IMB for lack of personal jurisdiction.

Affirmed.

. According to the government, the accounts were held in the name of Rosebud Investments, Ltd., White Rose Investments, Ltd., Handle Investments, Ltd., J & B Investments, Ltd., and Guardian Bank, Ltd. For clarity's sake, we refer to them collectively as "Fitzgerald's accounts.”

. The government failed to serve Swiss American Holding Company. As a result, it is not a party to this litigation.

. Enacted in 1993, the Rule provides:
If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.
Fed.R.Civ.P. 4(k)(2).

. Because we consider only contacts established before the government filed its complaint in December 1997, see Noonan, 135 F.3d at 93 n. 8, the appearance of information about SAB on the internet in 1998 is not relevant to our analysis.

. There is record evidence (in a report from the government’s investigator) that Herring-ton made phone calls to Boston in 1986 during the period in which Fitzgerald was setting up his SAB accounts. However, the report does not specify that Fitzgerald was the recipient of those calls.

. The second Calder defendant had other contacts with the forum, such as the telephone calls he made to sources located in California. Calder, 465 U.S. at 785-86, 104 S.Ct. 1482.

. Without conducting an exhaustive review of the case law, we note that several circuits do not appear to agree as to how to read Calder. Compare Oriental Trading Co., Inc. v. Firetti, 236 F.3d 938, 943 (8th Cir.2001) (emphasizing numerous faxes and telephone calls into the forum in finding jurisdiction under Calder), and Wien Air Alaska, Inc. v. Brandt, 195 F.3d 208, 212 (5th Cir.1999) (same), with IMO Ind., Inc. v. Kiekert AG, 155 F.3d 254, 260 (3d Cir.1998) ("Generally speaking, under Calder an intentional tort directed at the plaintiff and having sufficient impact upon it in the forum may suffice to enhance otherwise insufficient contacts with the forum such that the 'minimum contacts’ prong of the Due Process test is satisfied."), and Lake, 817 F.2d at 1423 (finding jurisdiction under Calder where nonresident attorney obtained ex parte order from out-of-forum court knowing it would be used to cause injury in the forum).