William M. DANTON, Plaintiff

v.

INNOVATIVE GAMING CORPORATION OF AMERICA, and Xertain, Inc., et al., Defendants

No. 02–201–P–H.

United States District Court, D. Maine.

Jan. 21, 2003.

Harold C. Pachios, Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Portland, ME, Sigmund D. Schultz, Preti Flaherty Beliveau Pachios & Haley, LLC, Portland, ME, for William M. Danton, plaintiff.

John A. Ciraldo, Perkins, Thompson, Hinckley & Keddy, Portland, ME, Stephen Douglas Wilson, Perkins, Thompson, Portland, ME, for Innovative Gaming Corporation of America, defendant.

## ORDER AFFIRMING RECOMMENDED DECISION OF THE MAGISTRATE JUDGE

HORNBY, District Judge.

The United States Magistrate Judge filed with the court on January 7, 2003, with copies to counsel, his Recommended Decision on Motion of Defendant Innovative Gaming Corporation of America to Dismiss. The plaintiff notified the court on January 17, 2003, that he does not object to the Recommended Decision. The Magistrate Judge had notified the parties that failure to object would waive their right to *de novo* review and appeal.

It is therefore ORDERED that the Recommended Decision of the Magistrate Judge is hereby ADOPTED. The defendant Innovative Gaming Corporation of America's motion to dismiss is GRANTED.

So ORDERED.

## *RECOMMENDED DECISION ON MOTION OF DEFENDANT INNOVATIVE GAMING CORPORATION OF AMERICA TO DISMISS*

DAVID M. COHEN, United States Magistrate Judge.

One of the two defendants named in the complaint, Innovative Gaming Corporation

of America ("IGCA"), moves to dismiss the claims against it for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2), or, in the alternative, to transfer venue. I recommend that the court grant the motion to dismiss.

## I. Applicable Legal Standard

A motion to dismiss for lack of personal jurisdiction raises the question whether a defendant has "purposefully established minimum contacts in the forum State." *Hancock v. Delta Air Lines, Inc.*, 793 F.Supp. 366, 367 (D.Me.1992) (citation and internal quotation marks omitted). The plaintiff bears the burden of establishing jurisdiction; however, where (as here) the court rules on a Rule 12(b)(2) motion without holding an evidentiary hearing, a *prima facie* showing suffices. *Archibald v. Archibald*, 826 F.Supp. 26, 28 (D.Me. 1993). Such a showing requires more than mere reference to unsupported allegations in the plaintiff's pleadings. *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir.1992). However, for purposes of considering a Rule 12(b)(2) motion the court will accept properly supported proffers of evidence as true. *Id.*

## II. Factual Background

The following facts, with conflicts resolved in favor of the plaintiff's properly supported proffers of evidence, are material to consideration of the pending motion.

The plaintiff, William M. Danton, is the holder, under assignment, of a promissory note that is due and payable in full. Complaint (Docket No. 1) ¶ 1. Defendant Xertain, Inc. is a Delaware corporation with a principal place of business in Las Vegas, Nevada. *Id.* ¶ 3. Defendant IGCA is a Minnesota corporation with a principal place of business also located in Las Vegas. *Id.* ¶ 4. Innovative Gaming, Inc. ("IGI") is a wholly-owned subsidiary of IGCA. *Id.* ¶ 5.

Fortune Entertainment Corporation ("Fortune") loaned Xertain $910,000 as evidenced by a promissory note dated June 13, 2000 with a maturity date of June 13, 2002, a copy of which is Exhibit 1 to the complaint. *Id.* ¶ 8. Fortune's East Coast office, located in Biddeford, Maine, wired a substantial portion of these funds to Xertain from the state of Maine. *Id.* ¶ 9. As of June 12, 2002 the sum of $540,118.17 remained due and payable on the note, with interest accruing at the rate of seven per cent per annum. *Id.* ¶ 10. On June 22, 2002 the note was assigned to the plaintiff. *Id.* ¶ 11.

In 1999, IGCA decided to get out of the business in which it had been engaged, which included developing, manufacturing, marketing and distributing video gaming machines. *Id.* ¶¶ 12–13. A vice-president of IGCA approached Steven M. Peterson to inquire whether he knew of anyone who might be interested in purchasing IGCA's gaming assets. *Id.* ¶ 15. Peterson, Roland M. Thomas and Thomas Foley formed Xertain on or about November 29, 1999 with the intent, *inter alia,* to purchase IGCA's gaming assets. *Id.* ¶ 16. Xertain and IGCA entered into an asset purchase agreement on February 1, 2000. *Id.* ¶ 19. Xertain extended the closing date for the asset sale at the request of IGCA. *Id.* ¶ 20. From April 2000 through September 2000 Xertain provided capital and resources to IGCA in an effort to assist IGCA in selling its gaming assets to Xertain and in merging with two other corporations. *Id.* ¶ 21.

Xertain became an exclusive distributor of IGCA gaming products in the state of California by agreement dated April 12, 2000 and outside the United States and Canada by agreement dated July 18, 2000. *Id.* ¶ 22. During the third quarter of fiscal 2000, revenue from Xertain's distributorship represented 26% of IGCA's sales. *Id.*

¶ 23. Xertain provided advance down payments on purchase orders in order to allow IGCA to complete the orders and avoid default. *Id.* ¶ 25. A substantial portion of the capital provided to IGCA by Xertain came from the loan evidenced by the note. *Id.* ¶ 26. Roland Thomas, the CEO of Xertain, assumed certain management functions at IGCA, brought customers to see IGCA operations and met with IGCA employees. *Id.* ¶ 28.

After Xertain refused IGCA's request to further extend the asset purchase agreement, the two companies entered into merger negotiations. *Id.* ¶¶ 29–31. On September 19, 2000 IGCA and Xertain entered into a letter of intent to merge and terminated the asset purchase agreement. *Id.* ¶ 36. They entered into a plan of merger on October 12, 2000. *Id.* ¶ 37. The merger "never formally closed." *Id.* ¶ 38. On September 19, 2000 Roland Thomas assumed the position of chairman and CEO of IGCA while retaining those positions with Xertain. *Id.* ¶ 39. He held these positions with IGCA until October 17, 2001 and the positions with Xertain through December 2000. *Id.* ¶ 57. Over $700,000 was transferred between IGCA and Xertain between May 16, 2000 and October 17, 2001. *Id.* ¶ 46. IGCA and Xertain shared the same address, facility, equipment and utilities. *Id.* ¶ 48.

On October 17, 2001 IGCA "took steps to separate itself from Xertain, to once again operate as a separate and distinct entity." *Id.* ¶ 61. At the present time, Xertain is unable to repay the note. *Id.* ¶ 63.

## III. Discussion

IGCA contends that the plaintiff cannot establish either general or specific personal jurisdiction over it and the action must accordingly be dismissed. Innovative Gaming Corporation of America's Motion to Dismiss, etc. ("Motion") (Docket No. 2) at 2.

■ Where, as here, the parties are residents of different states, the exercise of personal jurisdiction over a non-resident defendant is governed by the forum state's long-arm jurisdiction statute. *American Express Int'l, Inc. v. Mendez–Capellan,* 889 F.2d 1175, 1178 (1st Cir.1989). Maine's long-arm jurisdiction statute applies by its terms "so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the United States Constitution, 14th amendment." 14 M.R.S.A. § 704–A(1). Therefore, on a motion to dismiss for lack of personal jurisdiction, this court's inquiry focuses on whether the assertion of jurisdiction violates due process. *See, e.g., Archibald v. Archibald,* 826 F.Supp. 26, 29 (D.Me.1993).

■ A court may have general or specific personal jurisdiction over the defendants in an action. General jurisdiction arises when the defendant has engaged in substantial or systematic and continuous activity, unrelated to the subject matter of the action, in the forum state. *Scott v. Jones,* 984 F.Supp. 37, 43 (D.Me.1997). Specific jurisdiction is based on a relationship between the forum and the particular acts or injuries that provide the basis for the action, that is, "where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts." *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1088–89 (1st Cir.1992). The Maine long-arm statute provides only for the exercise of specific jurisdiction. *Lorelei Corp. v. County of Guadalupe,* 940 F.2d 717, 720 (1st Cir.1991). The plaintiff presses his claim under both types of jurisdiction. Plaintiff William M. Danton's Objection to Defendant IGCA's Motion to

Dismiss ("Opposition") (Docket No. 3) at 1–2.

With respect to a claim of general jurisdiction, the First Circuit has noted that the standard for evaluating the question whether contacts by a defendant with the forum state satisfy the constitutional test for general personal jurisdiction is "considerably more stringent" than the standard applied to claims of specific personal jurisdiction. *Noonan v. Winston Co.*, 135 F.3d 85, 93 (1st Cir.1998) (quoting *Glater v. Eli Lilly & Co.*, 744 F.2d 213, 216 (1st Cir.1984)). In that case, the First Circuit determined that the following were not sufficient minimum contacts to authorize general jurisdiction: (i) a visit by an employee of the defendant to the forum state sixteen years before the conduct that formed the basis of the allegations in the complaint, during which the employee took the photograph of the plaintiff that was allegedly used without his permission sixteen years later; (ii) the defendant's solicitation of business in the forum state during the eighteen months before the complaint was filed by calling, faxing and writing a potential customer in the forum state, sending employees into the forum state on at least two occasions with the intention of developing a relationship with the potential customer and seeking business relationships with two other companies in the forum state; and (iii) taking approximately $585,000 in orders from the customer described above. *Id.* at 87, 92–93. In *Sandstrom v. ChemLawn Corp.*, 904 F.2d 83 (1st Cir.1990), the First Circuit held that the following were not sufficient contacts to authorize general jurisdiction: "licensure and appointment of an agent for service of process; advertising; and litigation activities," *id.* at 89. The defendant never did business in the forum state, advertised in the forum state only for employees for a location outside the forum state, and engaged in litigation only as a defendant in a single previous action. *Id.* Significantly, the First Circuit relied in *Sandstrom* on *Seymour v. Parke, Davis & Co.*, 423 F.2d 584 (1st Cir.1970), in which it held that the Constitution would not permit the exercise of general jurisdiction over a defendant that employed several salesmen who transacted business in the forum state and advertised in the forum state by mail and otherwise, *Sandstrom*, 904 F.2d at 89. And in *Glater* the First Circuit held that the following were not sufficient contacts to authorize general jurisdiction: (i) the defendant conceded that it did business in the forum state; (ii) the defendant engaged in limited advertising in professional trade journals that circulated in the forum state; and (iii) it employed eight sales representatives whose duties included providing information to individuals and businesses in the forum state who could purchase its products from independent distributors in the forum state. 744 F.2d at 214–15, 217.

■ Here, the plaintiff contends that general personal jurisdiction over IGCA is established in two ways: because IGCA is the alter ego of Xertain, whose contacts with the state of Maine may thus be imputed to IGCA, and because IGCA itself "has had substantial and continuous contact with Maine through an overseas Distributorship Agreement with the East Coast Office of Fortune," Opposition at 5, which originated the note at issue and assigned it to the plaintiff. With respect to the second contention, the plaintiff offers the following factual assertions:

Through June 2000 the headquarters of Fortune were located in Biddeford, Maine and thereafter Fortune maintained an east coast office there. Affidavit of William M. Danton ("Plaintiff's Aff.") (Docket No. 4) ¶ 3. While CEO of IGCA, Thomas came to Maine to discuss opening new markets for

IGCA. *Id.* ¶ 10. Innovating Gaming, Inc., a wholly-owned subsidiary of IGCA, entered into a distributorship agreement for South and Central America with Fortune dated November 7, 2000. *Id.* ¶ 11. Fortune "was responsible for and engaged in substantial communication on behalf of IGCA originating in Maine." *Id.* ¶ 12. IGCA communicated directly with the plaintiff "in connection with the distribution agreement." *Id.* ¶ 13. The distributorship agreement resulted in the sale of about 30 gaming machines to the Republic of Peru. *Id.* ¶ 14. IGCA was never paid for this equipment. Second Affidavit of Loren A. Piel in Support of Innovative Gaming Corporation of America's Reply Memorandum ("Second Piel Aff.") (Docket No. 8) ¶ 19. IGCA asserts that the contacts at issue were those of its subsidiary and may not be imputed to IGCA and that, in any event, the contacts are insufficient to establish general jurisdiction under First Circuit precedent. Innovative Gaming Corporation of American's Reply Memorandum in Support of Motion to Dismiss ("Reply") (Docket No. 7) at 5–6.

It is unnecessary to decide whether general jurisdiction may be exercised over IGCA as a result of the actions of its subsidiary because those actions, as set forth by the plaintiff, are insufficient to meet the constitutional requirements for the exercise of general personal jurisdiction under existing First Circuit case law, some of which is discussed above. *See United States v. Swiss Am. Bank, Ltd.,* 274 F.3d 610, 627 (1st Cir.2001).

■ With respect to the plaintiff's alter ego theory, IGCA's argument emphasizes that Xertain and IGCA were clearly separate entities at the time the complaint in this action was filed. Reply at 4. As a general rule, "personal jurisdiction depends on the defendant's contacts with the forum state at the time the lawsuit was filed," *Klinghoffer v. S.N.C. Achille Lauro Ed Altri–Gestione Motonave Achille Lauro in Amministrazione Straordinaria,* 937 F.2d 44, 52 (2d Cir.1991), but due process requires that "courts must examine the defendant's contacts with the forum at the time of the events underlying the dispute when determining whether they have jurisdiction," *Steel v. United States,* 813 F.2d 1545, 1549 (9th Cir.1987). The fact that IGCA and Xertain were clearly separate entities, by the terms of the plaintiff's own complaint, at the time the complaint was filed, thus has bearing on the question whether the plaintiff may establish general jurisdiction over IGCA by virtue of Xertain's activities in Maine that gave rise to the complaint, but it does not foreclose consideration of that question.

■ The plaintiff asserts that the following facts establish that this court may exercise general jurisdiction over Xertain and that such jurisdiction may be imputed to IGCA: "The joint CEO of Xertain and IGCA, Roland M. Thomas, traveled to Maine, transacted business in Maine, solicited and discussed the loan at issue in this lawsuit . . . and Xertain received those monies by wire transfer from a Maine banking institution." Opposition at 5. The conclusory reference to Thomas transacting business in Maine is expanded upon in the plaintiff's affidavit, in which he states that Thomas "traveled to Maine in person on many occasions for many days in 1999 and 2000 to discuss strategic and business alliances and opportunities among and between [Fortune], Xertain, and [IGCA], and related business matters." Plaintiff's Aff. ¶ 7. The plaintiff also states that Thomas "engaged in a great deal of business-related communication with me and others in [Fortune's] East Coast Office on behalf of Xertain." *Id.* ¶ 8. Neither the complaint nor the plaintiff's affidavit identifies any "strategic and business alliances and op-

portunities" involving Xertain other than the investment and note that gives rise to this action. Again, application of First Circuit precedent requires the conclusion that the plaintiff has provided an insufficient factual basis on which to establish general personal jurisdiction over Xertain in this court, and accordingly there is no need to reach the plaintiff's alter ego argument on this point.

■■■■ With respect to specific jurisdiction, the First Circuit has developed the following test:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

*163 Pleasant St.,* 960 F.2d at 1089. The "Gestalt factors" comprise

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

*Id.* at 1088. Once the plaintiff makes a *prima facie* showing of relatedness and minimum contacts/purposeful availment, the burden shifts to the defendant to convince the court that the Gestalt factors militate against the exercise of jurisdiction. *Coolidge v. Judith Gap Lumber Co.,* 808 F.Supp. 889, 891 (D.Me.1992); *see also Foster–Miller, Inc. v. Babcock & Wilcox*

*Canada,* 46 F.3d 138, 145 (1st Cir.1995) (plaintiff "must carry the devoir of persuasion on the elements of relatedness and minimum contacts") (citations omitted).

The plaintiff offers essentially the same facts as the basis for specific personal jurisdiction over Xertain. Opposition at 5, 6–7. These facts are sufficient to provide this court with specific personal jurisdiction over Xertain. It therefore becomes necessary to consider the plaintiff's contention that such jurisdiction may be extended to IGCA as the asserted alter ego of Xertain.

■■■■ Initially, it must be noted that the plaintiff's proffered evidence of alter ego status begins after the note on which he seeks to recover was executed and ends well before this action was filed. The note is dated June 13, 2000. Complaint, Exh. 1 at 1. The plaintiff contends that "IGCA and Xertain were sharing the same resources, the same facility, the same management, and … all Xertain employees became IGCA employees;" that "IGCA drained Xertain's assets leaving it with virtually no cash or ability to obtain cash" (internal quotation marks omitted); that "IGCA adopted Xertain's business plan, and both entities were jointly engaged in activities and operations for the sole benefit of IGCA" (internal quotation marks omitted); that the two entities shared the same CEO from September 19, 2000 through October 17, 2001; that the two entities commingled over $500,000; and that they shared a joint business plan. Opposition at 3–4. The affidavits submitted by the plaintiff in support of these factual assertions establish that none of these events took place before September 19, 2000 or after October 17, 2001. Affidavit of Steven M. Peterson (Docket No. 5) ¶ 4; Affidavit of Roland Thomas (Docket No. 6) ¶ 8. IGCA disputes some of these

factual assertions. Second Piel Aff. ¶¶ 8–9, 11–12, 15, 17. IGCA provides evidence that the two entities always maintained separate books, records and bank accounts; that IGCA informed the Securities and Exchange Commission in its September 30, 2001 filing that it had booked a bad debt adjustment of $512,000 on its advances to Xertain; that the two entities maintained separate legal counsel for all but one matter; and that the two entities maintained separate accounting firms and auditors except for consolidated financial statements prepared in 2001 in anticipation of the proposed merger, which never took place. *Id.* ¶¶ 4–5, 7, 12–13, 23.

[F]ederal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court. The theory underlying these cases is that, because the two corporations (or the corporation and its individual alter ego) are the *same entity,* the jurisdictional contacts of one *are* the jurisdictional contacts of the other for the ·purposes of the … due process analysis.

*Patin v. Thoroughbred Power Boats Inc.,* 294 F.3d 640, 653 (5th Cir.2002) (emphasis in original). The case law cited by the *Patin* court involves subsidiary corporations, successor corporations and corporate officers or stockholders; none involves two corporations that remained separate, at least in title, throughout the relevant period. *Id.* at 652 n. 18. The First Circuit has recognized the possibility that personal jurisdiction may be obtained over a corporate alter ego, but only in the context of subsidiary corporations. *Swiss Am. Bank,* 274 F.3d at 627 & cases cited therein.

Under the alter ego rule, a non-resident parent corporation is amenable to suit in the forum state if the parent company exerts so much control over the subsidiary that the two do not exist as separate entities but are one and the same for purposes of jurisdiction. If the court finds one entity to be the alter ego of the other, jurisdiction over the subsidiary results in jurisdiction over the non-resident parent.

To determine whether a parent corporation and its subsidiary maintain separate corporate identities, a court examines factors that demonstrate whether corporate formalities have been observed. These factors include whether the parent corporation and its subsidiary were separately incorporated, had separate boards of directors, maintained separate financial records, and had separate facilities and operating personnel.

*Russell v. Enterprise Rent–A–Car Co. of Rhode Island,* 160 F.Supp.2d 239, 252 (D.R.I.2001) (citations omitted). Assuming *arguendo* that the First Circuit's recognition of the alter ego theory of personal jurisdiction may be extended beyond the parent-subsidiary corporate relationship, the plaintiff has presented evidence to meet only the final factor of this test, suggesting that IGCA and Xertain shared facilities and personnel for a period of about one year beginning three months after the note at issue was executed and ending about one year before this action was brought. That is not sufficient to allow this court to exercise specific personal jurisdiction over IGCA.

 The plaintiff contends that Nevada law applies to a determination of the corporations' possible status as alter egos for· purposes of this court's jurisdictional analysis because the note at issue specifies that it is to be construed in accordance

with Nevada law. Opposition at 9 & n. 1. That term of the note, on its face, applies only to construction of the note, which is not at issue in connection with this motion to dismiss. In diversity cases, like this one, jurisdiction is to be determined by application of the law of the forum state. *Daynard v. Ness. Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 51–52 (1st Cir.2002). Maine case law does not address the issue of acquiring jurisdiction over a non-resident entity through alter ego status; the existing standards of the First Circuit have been discussed above and it is unlikely that the Maine Law Court would differ if presented with the question. In the unlikely event that Nevada law does apply to a determination of this question, each of the cases cited by the plaintiff, none of which addresses the issue of jurisdiction, is distinguishable on its facts as well.

In *Polaris Indus. Corp. v. Kaplan*, 103 Nev. 598, 747 P.2d 884 (1987), the issue was whether a corporate officer could be held liable as an alter ego of the corporation. The officer had used the corporation's funds as his own and "certain corporate formalities were not observed." *Id.* at 887. For the purpose of evaluating the officer's possible liability, the court stated:

> There are three general requirements for application of the alter ego doctrine: (1) the corporation must be influenced and governed by the person asserted to be the alter ego; (2) there must be such unity of interest and ownership that one is inseparable from the other; and (3) the facts must be such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction fraud or promote injustice.

*Id.* at 886. Here, the evidence submitted by the plaintiff, even with the benefit of the drawing of all reasonable favorable inferences, cannot be construed to have established the second of these elements. In addition, for all that appears in the record, jurisdiction over IGCA is available in Nevada, so that adherence to the corporate fiction in this case would not necessarily promote injustice.

In *Bonanza Hotel Gift Shop, Inc. v. Bonanza No. 2*, 95 Nev. 463, 596 P.2d 227 (1979), the issue was whether the corporate parents of defendant Bonanza No. 2 could be held liable for its obligations to the plaintiff. *Id.* at 228. The court applied the same test articulated in *Kaplan, id.* at 886, and the same analysis prevails. The same is true of *Lipshie v. Tracy Inv. Co.*, 93 Nev. 370, 566 P.2d 819, 823 (1977), the final case cited by the plaintiff.

Because I conclude that IGCA's motion to dismiss should be granted, there is no need to consider its alternative request based on the doctrine of *forum non conveniens.*

## IV. Conclusion

For the foregoing reasons, I recommend that the motion of defendant Innovative Gaming Corporation of America to dismiss be **GRANTED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

74

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

January 7, 2003.