**NEW LIFE BROKERAGE SERVICES,
INC. and New Life Holding
Company, Inc., Plaintiffs**

v.

**CAL–SURANCE ASSOCIATES,
INC., Defendant**

No. CIV. 01–172–B–C.

United States District Court,
D. Maine.

Sept. 16, 2002.

Todd S. Holbrook, Esq., Bernstein, Shur, Sawyer, & Nelson, Portland, ME, for New Life Brokerage Services Inc dba NLBS Advisers, New Life Holding Company Inc., plaintiffs.

John B. Lucy, Richardson, Whitman, Large & Badger, Bangor, ME, John S. Whitman, Richardson, Whitman, Large & Badger, Portland, ME, for Cal–Surance Associates Inc, defendant.

## ORDER AFFIRMING THE RECOMMENDED DECISION OF THE MAGISTRATE JUDGE

GENE CARTER, District Judge.

The United States Magistrate Judge having filed with the Court on June 26, 2002, with copies to counsel, her Recommended Decision on Defendant's Motion to Dismiss (Docket No. 72); and the time for

filing objections thereto having expired without any objections having been filed; *see* 28 U.S.C. § 636(b)(1); and this Court having reviewed and considered the Magistrate Judge's Recommended Decision, together with the entire record; and having made a *de novo* determination of all matters adjudicated by the Magistrate Judge's Recommended Decision; and this Court concurring with the recommendations of the United States Magistrate Judge for the reasons set forth in her Recommended Decision, and having determined that no further proceeding is necessary; it is **ORDERED** as follows:

(1) The Recommended Decision of the Magistrate Judge is hereby **AFFIRMED**.

(2) Defendant's Motion to Dismiss is hereby **DENIED** because the Court has personal jurisdiction in this matter and the venue is proper.

## RECOMMENDED DECISION ON DEFENDANT'S MOTION TO DISMISS

KRAVCHUK, United States Magistrate Judge.

Plaintiffs brought this action after its insurance claim was not covered under the policy the insurance broker, defendant Cal–Surance Associates, Inc. ("CSA"), recommended and procured for plaintiffs. CSA agreed to design and obtain appropriate coverage for New Life's securities business, but allegedly failed to do so thereby committing breach of contract (Count I), breach of fiduciary duty (Count II), professional negligence (Count III), negligent misrepresentation (Count IV), and fraud (Count V). CSA filed the present Motion to Dismiss asserting improper venue and lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) and (3). (Docket No. 13.) I recommend that the Court **DENY** the motion to dismiss as the Court has personal jurisdiction and venue is proper.

### Rule 12(b)(2) and (3) Standards of Review

When facing a motion to dismiss for lack of personal jurisdiction under Fed. R.Civ.P. 12(b)(2), the plaintiff bears the burden of establishing that jurisdiction is proper. *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir.2001). When an evidentiary hearing is not held to determine whether personal jurisdiction exists, the plaintiff must make a *prima facie* showing of jurisdiction, rather than the preponderance of evidence standard, by "citing to specific evidence in the record that, 'if credited, is enough to support findings of all facts essential to personal jurisdiction.'" *Snell v. Bob Fisher Enter., Inc.*, 115 F.Supp.2d 17, 20 (D.Me.2000) (quoting *Boit v. Gar–Tec Products*, 967 F.2d 671, 675 (1st Cir.1992)). "To defeat a motion to dismiss when the court uses this method the plaintiff must make the showing as to every fact required to satisfy 'both the forum's long-arm statute and the due process clause of the Constitution.'" *Boit*, 967 F.2d at 675. In so doing, the plaintiff must make affirmative proof beyond the pleadings. *Id.* (citations omitted). When determining whether the plaintiff has made the requisite *prima facie* showing, the court considers the pleadings, affidavits, and exhibits filed by the parties. *Id.*; *Snell*, 115 F.Supp.2d at 20. For the purposes of such a review, plaintiff's properly supported proffers of evidence are accepted as true and disputed facts are viewed in a light favorable to the plaintiff, however unsupported allegations in the pleadings need not be credited. *Boit*, 967 F.2d at 675.

A motion to dismiss based on improper venue under Fed.R.Civ.P. 12(b)(3) triggers a burden on the plaintiff to demonstrate that it has brought the action in a

permissible forum. *Cordis Corp. v. Cardiac Pacemakers,* 599 F.2d 1085, 1086 (1st Cir.1979). The procedural analysis applied in determining a challenge to venue follows the procedure for analysis employed in a motion under Rule 12(b)(2). *Global Health Alternatives, Inc. v. Ellon U.S.A., Inc.,* 1999 WL 33117099, at *1 (D.Me. March 24, 1999) (citing *M.K.C. Equip. Co. v. M.A.I.L.Code, Inc.,* 843 F.Supp. 679, 682–83 (D.Kan.1994)).

## Background

■ The following facts are taken from the complaint and other materials submitted by the parties.[1] Plaintiff New Life Brokerage Services, Inc. is a securities broker and dealer with a principal place of business in Maine. (Compl.¶¶ 1, 2.) In 1993, New Life Brokerage Services reorganized as a wholly owned subsidiary of New Life Holding Company, Inc.; also a plaintiff and a Maine corporation. (*Id.* ¶¶ 1, 4.) The two companies, jointly referred to here as "New Life," sought insurance coverage to protect themselves against improper acts by their registered representatives. (*Id.* ¶¶ 1, 13.) All of New Life's employees and the majority of its registered representatives were located in Maine. (Zimmerman Decl. ¶ 6.) Defendant Cal–Surance Associates, Inc. ("CSA") is a California corporation with a principal place of business in California. (Compl.¶ 5.) CSA is an insurance broker that sells Errors and Omissions policies to insurance agents, real estate brokers, and securities brokers. (*Id.* ¶ 17; Bernard Aff. ¶ 3.) CSA specializes, and holds itself out as an expert, in designing insurance programs and obtaining insurance for securities broker-dealers. (Compl.¶¶ 18–21.)

CSA does not have Maine based agents or representatives, although it has some Maine customers and in 1994 a representative visited New Life in Maine. (Bernard Aff. ¶¶ 5–6; Knowles Aff. ¶ 5.)

Paul Zimmerman, the president of New Life, met a representative of CSA at a trade event/national conference of securities sellers, which took place in a state other than Maine or California. (*Id.* ¶¶ 11, 14; Zimmerman Decl. ¶¶ 1, 8, 9.) Zimmerman had previously seen CSA's advertisements in trade publications. (Compl.¶ 14.) At the trade event, CSA encouraged New Life to take some promotion materials and to call them, knowing that New Life was located in Maine. (Zimmerman Decl. ¶¶ 11–12.) Later, in promoting its insurance brokerage services, CSA sent promotional materials to New Life in Maine. (*Id.* ¶ 13; Compl. ¶ 12.) As a result of the initial meeting with CSA at the trade event, Zimmerman contacted CSA in 1993, and requested a quote for Errors and Omissions ("E & O") liability coverage. (Compl. ¶ 15; Zimmerman Decl. ¶ 14.) After several telephone conversations in which Zimmerman described the details of New Life's business to CSA, CSA sent a quote for E & O coverage to New Life. (Zimmerman Decl. ¶¶ 15–16.) In a June 4, 1993 letter sent to New Life, CSA recommended certain insurance for New Life's business and promoted CSA's services. (Holbrook Decl. Ex. J.) Prior to contracting with CSA, New Life had heard oral representations and received written representations from CSA representatives regarding CSA's expertise, including statements such as, "[CSA] has been in business for over 30

---

**1.** Consideration of the parties' affidavits and exhibits in the context of determining relevant jurisdictional facts does not require conversion of this motion to dismiss to a motion for summary judgment. *See Boit,* 967 F.2d at 675; *Telford Aviation, Inc. v. Raycom Nat.,* *Inc.,* 122 F.Supp.2d 44, 45 n. 1 (D.Me.2000) (citing Fed.R.Civ.P. 12(b) (stating that conversion applies when motion is based on failure to state a claim upon which relief can be granted) and citing *VDI Technologies v. Price,* 781 F.Supp. 85, 87 (D.N.H.1991)).

years, 15 in Professional Liability, which makes us experts in this field" and "[CSA] offers coverage enhancements not available through other brokers" and "[a] full staff of specialists in Errors and Omissions Insurance represent you to protect your assets and reputation." (Compl.¶¶ 22, 24.) Further, CSA made statements that it has been designing and administering E & O programs for over seventeen years, it pioneered E & O programs for broker-dealers and their representatives, and it has the premium base with insurance companies to create and adapt a truly custom program. (*Id.* ¶ 22.) These representations were also found in the promotional material New Life received at the trade event and in the mail from CSA. (Zimmerman Decl. ¶ 13.)

Based on these representations and on CSA's quote, New Life contracted with CSA in 1993 to obtain insurance coverage that included E & O insurance.[2] (*Id.* ¶ 25; Zimmerman Decl. ¶ 17.) CSA contracted to act as New Life's agent in designing and procuring appropriate types and levels of insurance coverage and agreed to provide services to New Life. (Compl.¶¶ 28, 29.) New Life entrusted CSA with its insurance needs and relied on CSA to care for its specific needs as a broker-dealer. (*Id.* ¶ 26.) CSA first designed and obtained insurance coverage for New Life in 1993. (*Id.* ¶ 32.) As CSA was not licensed by the Bureau of Insurance to conduct business in Maine, it was initially required to bill through a local agency. (Holbrook Decl. Ex. K; Pl.'s Opp'n to Mot. to Dismiss at 4–5.) CSA billed New Life through the Dunlap Corporation, a Maine company, on at least one occasion (Zimmerman Decl. ¶ 35, Ex. E & G.) CSA later became licensed to sell insurance in Maine on August 21, 1997. (Holbrook Decl. ¶ 2, Ex. I.) Subsequently, CSA wrote to New Life requesting that it send payments directly to CSA in California. (Zimmerman Decl. ¶ 36, Ex. H.)

The insurance CSA procured for New Life in 1993 was a one-year policy. Near the end of the first policy year and in succeeding years, CSA contacted New Life by mail suggesting that it purchase insurance for the following year and requesting additional information in connection with preparing a quote for the policy renewal. (Zimmerman Decl. ¶ 18, Ex. A & B.) Every year from 1993 to 1999, CSA re-designed, shopped, and obtained insurance coverage for New Life. (Compl.¶ 33.) On each occasion, CSA represented to New Life that the coverage designed by CSA and provided by the insurer was appropriate for New Life's business. (*Id.* ¶ 34.) New Life had previously informed CSA at the 1993 trade event that it needed protection against unforeseen acts by its employees and at that time CSA responded in part by stating that coverage was not available to protect against "selling away." (Compl. ¶ 30; Pl.'s Answer to Interrog. ¶ 3.) "Selling away" is a term of art in the securities field used when a registered representative sells securities not approved for sale by the employer and/or the state. (Compl.¶ 31.) During the course of CSA's involvement with New Life, CSA neither advised New Life that "selling away" coverage was available nor attempted to obtain this coverage prior to 1999. (*Id.* ¶¶ 36–37.) Based on CSA's representations of expertise, New Life believed that it was adequately protected against the risks posed by its business and its use of independent contractors to sell securities. (Zimmerman Decl. ¶ 20.)

In November 1997, New Life learned from the Maine Bureau of Banking, Securities Division ("Securities Division") that a representative of New Life had been sell-

---

**2.** The record does not reveal where or by what means (i.e. in person, by telephone or mail, etc.) the parties entered into the contract.

ing securities not approved for sale in Maine. (*Id.* ¶¶ 21, 37; Compl. ¶ 38.) The Securities Division accused New Life of failing to properly oversee the representative's activities, which is a violation of law. (Zimmerman Decl. ¶ 27.) The Securities Division required New Life to either forfeit its securities broker-dealer license or repurchase the outstanding unregistered securities its representative sold. (Compl.¶ 43.) New Life contacted it insurer, Zurich–American Insurance Company of Illinois ("Zurich") through its agent Lancer Claims Service, Inc. ("Lancer") which is a subsidiary of CSA. (*Id.* ¶¶ 44, 45.) When New Life informed Lancer of the improper sales by New Life's representative, Lancer denied coverage, citing the policy exclusion for "selling away." (*Id.* ¶ 47; Zimmerman Decl. ¶ 28.)

The insurance policies CSA obtained for New Life were "claims made" policies, meaning they insured against any claims made in the policy year even if the underlying actions occurred in the prior policy year. (Compl.¶ 35.) After the "selling away" allegations arose, but before New Life went out of business, New Life specifically directed CSA to obtain insurance coverage that would protect it against the assertions of "selling away." (*Id.* ¶ 50.) CSA obtained such coverage for New Life's 1999 policy year from Pacific Employers Insurance Company ("Pacific"), a CIGNA company. (*Id.* ¶ 51.) The Pacific insurance coverage protected against "selling away" and, although it otherwise provided the same coverage as New Life's 1997 and 1998 policies, it was less expensive. (*Id.* ¶ 52.) Shortly after obtaining this "selling away" coverage for New Life, CSA sent New Life a "Notice of Program Discontinuation" stating that CSA was not in a position to continue as a broker for New Life's professional liability insurance policy. (*Id.* ¶ 58.) Further, the notice stated, "We believe your firm can be more effectively serviced by a company that spe-

cializes in dealing with firms of your size and the issues that are unique to you." (*Id.*) Prior to this notice CSA repeatedly represented itself as "the specialist" in broker-dealer E & O coverage and never indicated it lacked expertise in dealing with firms like New Life. (*Id.* ¶ 59.)

New Life had to forfeit its securities license and was ultimately forced out of business because its insurance did not cover "selling away" and New Life could not afford to repurchase the securities as the Securities Division requested. (*Id.* ¶ 48.) After the fact, New Life learned that insurance coverage was available in 1997 and 1998 that would have protected it from the "selling away" claims that arose during those years. (*Id.* ¶¶ 54, 55.) According to the complaint, CSA obtained New Life's 1997 and 1998 policies from Zurich rather than from Pacific or another insurance company because CSA earned a greater commission on the Zurich policies. (*Id.* ¶ 53.) During 1997 and 1998, CSA worked with insurance companies to provide "selling away" coverage to securities broker-dealers. (*Id.* ¶ 56.) Had CSA obtained "selling away" coverage for New Life in 1997 and 1998 from one of these companies, New Life would have been insured, would still be in business, and would not have been forced to forfeit its securities license. (*Id.* ¶ 57; Zimmerman Decl. ¶ 32.)

The complaint states that CSA is licensed to do business in Maine and therefore is subject to jurisdiction in Maine. (Compl.¶ 6.) According to the complaint, venue is proper because CSA's wrongful acts were directed into and have occurred in this district. (*Id.* ¶ 8.)

### Discussion

#### A. *Personal Jurisdiction*

■ Before a court can exercise personal jurisdiction over a non-resident defendant, a two-part inquiry must be made.

The court determines whether the forum state's long-arm statute authorizes the exercise of jurisdiction and whether this exercise of jurisdiction complies with the Due Process Clause of the United States Constitution. *Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir.1994). Maine's long-arm statute, 14 M.R.S.A. § 704–A, permits jurisdiction over non-resident defendants to the extent allowed by the Due Process Clause, therefore the two inquiries merge into one.[3] *Archibald v. Archibald*, 826 F.Supp. 26, 28–29 (D.Me.1993) (citations omitted). Consequently, the focus turns to whether the exercise of jurisdiction over the defendant violates due process. *Id.* at 29.

▄▄▄▄ Due process requires that the defendant must have sufficient contacts with the forum state so that subjecting the defendant to the forum's jurisdiction does not offend "traditional notions of fair play and substantial justice." *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1087 (1st Cir.1992) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). The applicable minimum contacts standard depends on whether the forum is exercising general jurisdiction or specific jurisdiction. *Archibald*, 826 F.Supp. at 29. General jurisdiction can be asserted over a non-resident defendant when the defendant's activities with the forum state are "substantial" or "continuous and systematic." *Id.* When the alleged contacts fail to support the exercise of general jurisdiction, the contacts may nonetheless support the exercise of specific jurisdiction. *Swiss Am. Bank, Ltd.*, 274 F.3d at 623 (citing *Phillips Exeter Acad. v. Howard Phillips Fund*, 196 F.3d 284, 288 (1st Cir.1999)). Specific jurisdiction "may be asserted where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts." *Pleasant St.*, 960 F.2d at 1088–89.

▄▄▄▄ Here, specific jurisdiction is at issue.[4] Whether specific jurisdiction exists "turns on an evaluation of 'the relationship between the defendant, the forum, and the litigation.'" *Archibald*, 826 F.Supp. at 30 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). This relationship is examined by the application of a tripartite test which considers (1) "whether the claim that undergirds the

---

3. Maine's long-arm statute, 14 M.R.S.A. § 704–A (2), in part provides:

   Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated in this section, thereby submits such person, and, if an individual, his personal representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts:

   A. The transaction of any business within this State;

   B. Doing or causing a tortious act to be done, or causing the consequences of a tortious act to occur within this State;

   C. The ownership, use or possession of any real estate situated in this State;

   D. Contracting to insure any person, property or risk located within this State at the time of contracting;

   E. Conception resulting in paternity …

   F. Contracting to supply services or things within this State;

   .    .    .    .    .

   I. Maintain any other relation to the State or to persons or property which affords a basis for the exercise of jurisdiction by the courts of this State consistent with the Constitution of the United States.

   *See* 14 M.R.S.A. § 704–A(2).

   Subsection (I) authorizes the exercise of jurisdiction over CSA to the extent permitted by due process.

4. New Life focuses on specific jurisdiction, but requests the Court to provide the opportunity to brief later the issue of general jurisdiction if necessary. As will be discussed below, the record supports the exercise of specific jurisdiction, therefore there is no need to delve into the general jurisdiction analysis.

litigation directly relates to or arises out of the defendant's contacts with the forum"; (2) "whether those contacts constitute purposeful availment of the benefits and protections afforded by the forum's laws"; and (3) whether, overall, it is reasonable to exercise jurisdiction in light of five factors that touch upon the fundamental fairness of exercising jurisdiction. *See Swiss Am. Bank, Ltd.*, 274 F.3d at 620–621. All three prongs of the tripartite test must be satisfied for this Court to exercise specific jurisdiction over CSA. *See Scott v. Jones*, 984 F.Supp. 37, 43 (D.Me.1997).

### 1. Relatedness

The first part of the tripartite test considers whether the claim underlying the litigation directly arises out of or relates to the defendant's contacts with the forum state. *Sawtelle v. Farrell*, 70 F.3d 1381, 1389 (1st Cir.1995). Relatedness is a requirement of proximate cause that is applied with a flexible approach. *Scott*, 984 F.Supp. at 44. It works to ensure fundamental fairness "by protecting a defendant from being hauled into an out-of-state forum based on a single contact with that forum that is wholly unrelated to the suit at issue." *Swiss Am. Bank, Ltd.*, 274 F.3d at 623 (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). As the relatedness analysis for tort and contract claims differ, they will be analyzed separately. *See Phillips Exeter Acad.*, 196 F.3d at 289.

### a. Breach of Contract Claim

■ Count I alleges that CSA entered into an agreement to design and procure appropriate insurance coverage for New Life's securities business. (Compl.¶ 61.) By failing to procure "selling away" coverage, CSA allegedly breached its contract. (*Id.* ¶¶ 63–64.) To satisfy the relatedness prong this claim must arise out of or relate to CSA's contacts with Maine. This re-

quirement is met in a breach of contract claim where defendant's forum-based activities are "instrumental either in the formation of the contract or in its breach." *Phillips Exeter Acad.*, 196 F.3d at 289 (citations omitted).

■ CSA's forum based activities that are relevant to this claim consist of CSA's communications sent to New Life in Maine. There is no doubt that a nonresident defendant's communications sent into Maine qualify as "contacts" with the forum. *See Scott*, 984 F.Supp. at 44 ("The transmission of information into [the forum state] by way of telephone or mail is unquestionably a contact for the purposes of [personal jurisdiction] analysis." (citing *Sawtelle*, 70 F.3d at 1389–90)). Although the trade event occurred outside the forum, CSA encouraged New Life to take its promotional material and call them knowing New Life was located in Maine. (Zimmerman Decl. ¶¶ 11–12.) As a result, New Life did request a quote from CSA for E & O coverage after the trade event. (*Id.* ¶ 14.) CSA sent New Life a quote by mail after an exchange of information over the telephone with New Life. (*Id.* ¶¶ 15–16.) Based on the quote it received in the mail, New Life purchased insurance through CSA. (*Id.* ¶ 17.) At some point after the trade event but before the purchase of insurance, CSA sent promotional materials to New Life in Maine. (*Id.* ¶ 13.) These promotional materials and the materials New Life received at the trade event contained representations by CSA regarding its expertise. (*Id.* ¶ 13; Compl. ¶¶ 22, 24.) Based on CSA's representations of expertise, New Life entered into a contract in 1993 with CSA in which CSA would design and procure appropriate insurance coverage for New Life's needs. (Compl.¶¶ 25, 28–29.) CSA recommended certain coverage to New Life in a June 4, 1993 letter it sent to Maine and that same year CSA

procured an insurance policy for New Life. (*Id.* ¶ 32; Holbrook Decl. Ex. J.) At the expiration of the 1993 policy, and each year thereafter until 1999, CSA contacted New Life by mail seeking New Life's continued business for the following year and requesting additional information in order to prepare a quote for the renewal. (Zimmerman Decl. ¶¶ 18–19, Ex. A & B.) On each of these occasions, CSA represented to New Life that the coverage it designed and procured was appropriate for New Life's business. (Compl.¶ 34.) In reliance upon CSA's annual representations that the procured insurance coverage was adequate, New Life renewed the contract with CSA each year. These contacts with Maine satisfy the relatedness prong as they are instrumental to the formation of the contract. As New Life's breach of contract claim relates to CSA's contacts with the forum, New Life has made its *prima facie* showing of relatedness for this claim.

### b. Tort Claims: Breach of Fiduciary Duty, Professional Negligence, Negligent Misrepresentation, and Fraud

As to the breach of fiduciary duty, professional negligence, and negligent misrepresentation claims (Counts II, III, and IV), the complaint alleges that CSA made statements holding itself out as an expert in securities broker-dealer insurance coverage, including E & O coverage. (*Id.* ¶¶ 67, 75, 83–84.) Through these statements and New Life's reliance, CSA allegedly undertook a fiduciary obligation to advise New Life about appropriate insurance coverage and to design appropriate coverage for New Life. (*Id.* ¶¶ 68, 69, 76, 85.) According to the complaint, CSA breached its fiduciary duties by failing to procure appropriate coverage and/or advise New Life about the availability "selling away coverage." (*Id.* ¶¶ 71–72.) Further, by undertaking a duty to advise New Life about appropriate coverage and to design such coverage but failing to do so, CSA committed professional negligence. (*Id.* ¶¶ 76–80.) CSA's omission of advice regarding the availability and desirability of "selling away" coverage allegedly led New Life to believe that no such coverage was available. (*Id.* ¶¶ 85–89.) According to the complaint, these omissions constitute negligent misrepresentation. (*Id.* ¶ 90.) As a result of CSA's acts or omissions, New Life did not have an insurance policy protecting it from liability when the representative engaged in "selling away." (*Id.* ¶ 47.)

In tort claims such as these, the relatedness test focuses on proximate cause; more specifically whether the plaintiff has established "cause in fact (i.e., the injury would not have occurred 'but for' the defendant's forum-state activity) and legal cause (i.e., the defendant's in-state conduct gave birth to the cause of action)." *See Mass. Sch. of Law at Andover. Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 35 (1st Cir.1998) (citing *Pleasant St.*, 960 F.2d at 1089; *Ticketmaster–NY, Inc. v. Alioto*, 26 F.3d 201, 207 (1st Cir.1994)). The defendant's in-state activities that are relevant to these claims consist of CSA's communications through the telephone and the mail directed to Maine. Although the trade event took place outside the forum, CSA encouraged New Life to take some promotion materials and to call them knowing New Life was located in Maine. (Zimmerman Decl. ¶¶ 11–12.) CSA later sent promotional materials to New Life in Maine in which CSA held itself out to be an expert. (*Id.* ¶ 13; Compl. ¶¶ 22, 24.) In a June 4, 1993 letter sent to New Life, CSA recommended certain insurance for New Life's business and promoted CSA's services. (Holbrook Decl. Ex. J.) At least once a year from 1993 to 1999, CSA contacted New Life in Maine and represented to New Life that the coverage CSA designed

and procured was appropriate for New Life's needs. (Compl. ¶¶ 33–34; Zimmerman Decl. ¶ 18.) CSA's communications directed to Maine failed to discuss, mention, or otherwise advise New Life of the availability or desirability of "selling away" coverage. (Compl. ¶ 36; Zimmerman Decl. ¶ 33.)

■ As stated above, CSA's communications directed to the forum qualify as "contacts." · See Scott, 984 F.Supp. at 44 (citing Sawtelle, 70 F.3d at 1389–90). However, these communications cannot be the basis for jurisdiction unless they have a causal nexus with New Life's claims. See Mass. Sch. of Law, 142 F.3d at 35–36. New Life entered into a contract and accepted the Zurich insurance coverage as a result of CSA's representations of its expertise and CSA's advice directed to Maine. (Compl. ¶ 25; Zimmerman Decl. ¶ 17.) Further, CSA's June 1993 letter and annual communications from 1993 to 1999 seeking renewal and representing the coverage as appropriate fail to advise New Life that "selling away" coverage was available. (Holbrook Decl. Ex. J; Compl. ¶¶ 34, 36; Zimmerman Decl. ¶ 18.) "But for" CSA's representations of expertise and alleged omissions in its communications, New Life would not have been led to believe that "selling away" coverage was unavailable. New Life asserts that had it been adequately advised, New Life would have sought after and obtained the "selling away" coverage that was available and therefore would have been protected from the fatal consequences of its representative's "selling away." Thus, the "cause in fact" portion of proximate cause has been satisfied.

Further, "legal cause" has been established. The gravamen of New Life's claims is that CSA failed to advise New Life about the availability and/or desirability of "selling away" coverage (Pl.'s Opp'n to Mot. to Dismiss at 7), as it allegedly was

obligated to do, thereby leading New Life to believe that it had the appropriate coverage and subjecting it to liability when "selling away" occurred. CSA's written and telephonic advice and recommendations were directed to Maine and "gave birth to the cause of action."

CSA analogizes this case with the facts of Sawtelle v. Farrell, 70 F.3d 1381 (1st Cir.1995) to support its assertion that jurisdiction cannot be premised on CSA's communications transmitted to Maine. (Def.'s Mot. to Dismiss at 7–9.) In Sawtelle, Florida attorneys communicated poor settlement recommendations into the New Hampshire forum through one telephone call and one letter. The injury was the plaintiff's loss of the right to an adequate recovery and this loss occurred in Florida where the court approved the settlement and terminated the lawsuit. Sawtelle, 70 F.3d at 1390 n. 5. However, the New Hampshire residents suffered the "effect" of the injury in the forum. Id. at 1390. The First Circuit found that the only contacts related to the plaintiff's malpractice claim were the telephone call and the letter. Id. at 1389. The malpractice claim alleged that defendants negligently negotiated an inadequate settlement, in part, by failing to take depositions, failing to obtain a projection of earning capacity, and failing to consult liability experts. Id. at 1387. The court's review of these negligent actions indicated that numerous decisions were reached by the defendants outside the forum state. Id. at 1390. The First Circuit concluded that the mailed letter and the telephone call were ancillary to the negligent conduct that caused the injury and stated that the defendants' out-of-forum negligence caused the Florida injury. Id.

In contrast, New Life does not assert that CSA was negligent in reviewing or researching available insurance coverage.

Such acts or omissions undoubtedly would have occurred in California. (Knowles Aff. ¶ 4.) Here, the claim that undergirds the litigation is that CSA was aware of "selling away" coverage and could have, but did not, recommend "selling away" coverage or advise New Life of the availability of such coverage. CSA directed communications into Maine which represented the procured insurance as appropriate coverage and failed to advise about or mention the availability of "selling away" coverage. (Compl.¶¶ 34, 36.) Thus, here the acts, omissions, or negligence underlying the claims are contained within CSA's communications transmitted into the forum. Furthermore, the relevant contacts here are not limited to two communications directed to the forum. On a yearly basis from 1993 to 1999, CSA contacted New Life and represented the procured coverage as appropriate and failed to inform New Life of "selling away" coverage. (*Id.*) Additionally, the relationship here is not a one-time transaction; CSA had an ongoing relationship with New Life in Maine for six years. Finally, unlike the defendant in *Sawtelle,* CSA caused an injury to occur within the forum. CSA's misrepresentations and/or omissions contained in its communications were detrimentally relied upon by New Life in Maine and resulted in New Life's failure to be covered from the "selling away" of its representative. Consequently, the injury to New Life occurred in Maine where New Life was not protected from liability. The "effects" of the injury also occurred in Maine when New Life was forced to forfeit its Maine license and to close its business. New Life's claims directly relate to CSA's communications, thus the letters and mail in this case are not ancillary to the claim. Based on the foregoing, New Life has met its *prima*

*facie* burden of showing relatedness for its tort claims.

◼◼◼ As to New Life's Count V claim of fraud, the complaint alleges that CSA held itself out to New Life as an expert in designing and obtaining securities broker-dealer insurance coverage, including E & O coverage. (Compl.¶ 93.) New Life allegedly and reasonably relied on these representations in deciding to use CSA's services and in relying on CSA's advice, but then in 1999, that the representations were false. (*Id.* ¶¶ 94, 96.) New Life asserts that had it not relied on CSA's misrepresentations, New Life would have earlier recognized the need for, recommended the purchase of, and obtained insurance that protects against "selling away." (*Id.* ¶ 97.) Of CSA's contacts with the forum, only two communications sent by mail relate to this claim. First, prior to the contract, CSA sent materials to New Life in Maine in which CSA represented itself as an expert.[5] (*Id.* ¶ 24; Zimmerman Decl. ¶ 13.) Second, in 1999, CSA mailed a "Notice of Program Discontinuation" in which CSA indicates it is not such an expert. (Compl.¶ 58.) The Notice states that CSA is not in a position to act as a broker for New Life and advises them to seek a brokerage that specializes in dealing with firms similar to New Life's size and having similar issues. (*Id.*) As the claim of fraud directly "relates to or arises out of" these contacts with the forum, New Life has made a *prima facie* showing of relatedness with this claim.

### 2. *Purposeful Availment*

◼◼◼ The purposeful availment prong examines whether the defendant's contacts with the forum "represent a purposeful availment of the privilege of con-

---

**5.** The record states that on other occasions CSA made written and oral statements representing itself as an expert, however no details have been provided regarding whether these statements were directed to the forum (*See* Compl. ¶ 23.)

ducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." *Pleasant St.,* 960 F.2d at 1089. This requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts or of the unilateral activity of another party or a third party." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (internal quotations and citations omitted). Under the purposeful availment requirement, even a single act can support jurisdiction so long as it creates a "substantial connection" with the forum. *Burger King,* 471 U.S. at 476 n. 18, 105 S.Ct. 2174. Two cornerstone elements of purposefulness guide the determination of purposeful availment: voluntariness and forseeability. *Scott,* 984 F.Supp. at 44.

### a. Voluntariness

The voluntariness element ensures that the defendant's contacts are not based on "the unilateral actions of another party or a third person." *Id.* (citing *Nowak v. Tak How Inv., Ltd.,* 94 F.3d 708, 715 (1st Cir. 1996)). CSA claims that it did not voluntarily avail itself to Maine because New Life sought out CSA and CSA merely sold a product when asked to by New Life. (Def.'s Mot. to Dismiss at 11.) According to the record, CSA solicited business at an out-of-state trade event where New Life happened to be present. (Zimmerman Decl. ¶¶ 10–12.) Knowing New Life was located in Maine, CSA encouraged New Life to take some of its promotion materials and to call them. (*Id.* ¶¶ 7, 11–12.) After this initial contact, New Life requested a quote from CSA. (*Id.* ¶ 14.) At some point following the trade event, CSA sent New Life promotional materials presumably in an effort to create a business relationship. (*Id.* ¶ 13.) CSA subsequent-

ly entered into a contract with New Life, advised New Life about insurance coverage, and procured insurance for the Maine business. (*Id.* ¶¶ 15–17; Compl. ¶¶ 25, 28, 32–34.) Viewing the facts in the light most favorable to New Life, CSA voluntarily directed efforts to Maine to establish a business relationship rather than merely responding to New Life's request for a quote. Moreover, when the first insurance policy was about to terminate, CSA requested New Life's renewal business by sending New Life requests for updates. (Zimmerman Decl. ¶ 18). CSA repeated this contact on an annual basis from 1993 to 1999 and further represented that the procured coverage was appropriate. (*Id.;* Compl. ¶¶ 33–34.) Thus, CSA voluntarily took steps to do business with the Maine business and solicit New Life's continued business. Based on these facts, a *prima facie* showing has been made that CSA's contacts with Maine are not the result of unilateral action taken by another, but are voluntary acts taken by CSA.

### b. Forseeablity

■ The second element of the purposeful availment prong, forseeablity, "guarantees that 'the defendant's contacts with the forum state [are] such that he should reasonably anticipate being haled into court there.'" *Scott,* 984 F.Supp. at 44–45 (citing *Nowak,* 94 F.3d at 716). Forseeablilty explores whether the defendant benefited from the forum-based contacts in a way that made jurisdiction foreseeable. *See Phillips Exeter Acad.,* 196 F.3d at 292 (citing *Ticketmaster–N.Y.,* 26 F.3d at 207). In general, the existence of a relationship or contract between the parties, without more, does not show that the defendant purposefully established minimum contacts with the forum. *See Burger King,* 471 U.S. at 478–79, 105 S.Ct. 2174; *Phillips Exeter Acad.,* 196 F.3d at 292 ("[T]he mere fact that defendant willingly

entered into a tendered relationship does not carry the day."). In order to determine whether the contractual relationship is a significant contact showing purposeful availment, the "contract-plus" analysis is applied. *Swiss Am. Bank*, 274 F.3d at 621; *Burger King*, 471 U.S. at 479, 105 S.Ct. 2174. The "contact-plus" analysis involves consideration of the parties' "prior negotiations and contemplated future consequences," the terms of the contract, and the parties' "actual course of dealing." *See Swiss Am. Bank*, 274 F.3d at 621. Prior negotiations regarding CSA's service occurred over the telephone and through the mail while the parties were located in their own forum. (Zimmerman Decl. ¶¶ 13–16.) Although the initial policy lasted only a year, CSA intended for the business relationship to continue as it sought to continue the relationship year after year when the policies it procured for New Life expired. As a result, CSA had an ongoing business relationship with New Life from 1993 to 1999. The terms of the contract involved insurance coverage for a Maine business and the acts of its representatives that were predominately located in Maine. (*Id.* ¶ 6; Compl. ¶¶ 29, 32.) The parties' course of dealing included CSA's annual review of the policy it procured and recommendations at the time of renewal. (Zimmerman Decl. ¶ 18; Compl. ¶¶ 33–34.) Moreover, CSA agreed to provide services including designing appropriate coverage for New Life and each year from 1993 to 1999 CSA re-designed, shopped, and obtained insurance for New Life. (Compl.¶¶ 28–29, 33.) Thus, CSA created a continuing obligation to inform and advise New Life of the appropriate coverage for its needs and to design and procure such appropriate coverage. When a defendant has established a continuing obligation between itself and the forum the exercise of jurisdiction is foreseeable. *Sawtelle*, 70 F.3d at 1393. Although the acts of researching and reviewing insur-

ance coverage occurred in California (Knowles Aff. ¶ 4), CSA directed its advice and recommendations to Maine each year. (Compl. ¶ 18; Zimmerman Decl. ¶ 34.) The foregoing "contract-plus" analysis demonstrates that CSA's contract with New Life constitutes a significant contact with the forum.

Aside from CSA's contractual relationship, CSA's in-forum contacts consist of CSA's procurement of insurance for New Life's Maine business, CSA's license to do business in Maine, and CSA's telephonic and mailed communications directed to Maine. Although CSA does not have agents or representatives based in Maine, CSA has other Maine customers and, in 1994, CSA had a representative physically present in Maine at a seminar for New Life personnel. (Bernard Aff. ¶¶ 5, 6; Knowles Aff. ¶ 5; Def.'s Mot. to Dismiss at 9.) CSA asserts that none of these contacts with Maine, in and of itself, is sufficient to establish purposeful availment. (Def.'s Mot. to Dismiss at 10.) However, this case does not involve only one of these contacts. Here, the totality of contacts is sufficient to establish purposeful availment. Like the defendant in *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351 (11th Cir.2000), CSA is an insurance broker who chose to do business with an out-of-state client and knew that the insurance was to cover forum-based property. *See Ruiz de Molina*, 207 F.3d at 1357. Similarly, CSA agreed to advise and procure insurance for the forum-based resident, actually procured insurance for that resident, and received a commission from the insurance premium. *See id.* These contacts are sufficient to establish that CSA "purposefully availed [itself] of the opportunity to do business with [a Maine] resident in [Maine]." *See id.*

CSA further claims that New Life cannot use the "ebb and flow of written and oral communication between the companies to make their case for purposeful availment." (Def.'s Mot. to Dismiss at 12.) CSA argues that its communications with New Life do not create a conscious effort by CSA to inject itself into Maine economic life. *Id.* However, "[t]he transmittal of . . . a misrepresentation, even if unwitting, has been held to represent substantial contacts for the purpose of finding personal jurisdiction." *Ganis Corp. of Cal. v. Jackson,* 822 F.2d 194, 198 (1st Cir.1987) (citing *Ealing Corp. v. Harrods, Ltd.,* 790 F.2d 978, 983 (1st Cir.1986) (analogizing a misrepresentation sent into a forum state with "the frequently hypothesized but rarely encountered gunman firing across a state line") and *Murphy v. Erwin–Wasey, Inc.,* 460 F.2d 661, 664 (1st Cir.1972)("We would be closing our eyes to the realities of modern business practices were we to hold that a corporation subjects itself to the jurisdiction of another state by sending a personal messenger into that state bearing a fraudulent misrepresentation but not when it follows the more ordinary course of employing the United States Postal Service as its messenger.")). Here, CSA directed communications to Maine, knowing they would be relied upon, in which it represented itself as an expert, failed to inform New Life of the appropriate coverage, and recommended or represented certain coverage as adequate for New Life when that coverage did not include "selling away" coverage. Thus, it is foreseeable that CSA would be subject to jurisdiction in Maine. *See Murphy,* 460 F.2d at 664 ("Where a defendant knowingly sends into a state a false statement, intending it to be relied upon to the injury of a resident of that state, he has, for jurisdictional purposes, acted within that state."). Based on the foregoing, New Life has made a *prima facie* showing of purposeful availment.

### 3. *Reasonableness*

The reasonableness prong focuses on whether the assertion of personal jurisdiction "comports with notions of 'fair play and substantial justice.'" *Scott,* 984 F.Supp. at 45 (citing *Nowak,* 94 F.3d at 717). In this portion of the tripartite analysis, when the plaintiff has made a *prima facie* showing of relatedness and purposeful availment the court then considers five factors commonly referred to as the Gestalt factors. *Pleasant St.,* 960 F.2d at 1088 (citing *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174). The five factors are: "(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies." *Id.* In close cases the Gestalt factors "may tip the constitutional balance" and thus establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts. *Swiss Am. Bank, Ltd.,* 274 F.3d at 635 (citing *Nowak,* 94 F.3d at 717 and *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174).

As to the defendant's burden of appearing in Maine, CSA merely asserts that its contacts and activity in Maine are marginal and that CSA's witnesses would have to be brought from California. (Def.'s Mot. to Dismiss at 12.) However, as discussed above, CSA's contacts with Maine are not marginal. Further, as litigation in another state is generally inconvenient and costly to non-resident parties, "the defendant must demonstrate that exercise of jurisdiction in the present circumstances is onerous in a special, unusual, or other constitutionally significant way." *See Swiss Am. Bank, Ltd.,* 274 F.3d at 635 (citing *Nowak,* 94 F.3d at 718 and *Pritz-*

*ker,* 42 F.3d at 64). CSA fails to argue an unusual or onerous burden. Thus, the first factor falls in New Life's favor.

The second factor inquires into the forum state's interest in adjudicating the dispute. Maine has an interest in a dispute between a Maine business and an insurance broker that agreed to, but failed to, properly advise and procure insurance for the Maine business. CSA fails to make an argument to the contrary. Accordingly, this factor falls in New Life's favor. The third factor considers New Life's interest in obtaining convenient and effective relief. As deference is to be given to the plaintiff's choice of forum and as plaintiff brought this action in its home state, this factor also falls in New Life's favor. *See Pritzker,* 42 F.3d at 64 (citing *Ticketmaster–NY,* 26 F.3d at 211).

The fourth factor focuses on the judicial system's interest in obtaining the most effective resolution of the controversy. As the parties have filed numerous motions and documents in this Court, have completed discovery, and have a trial date scheduled for July, 2002, the transfer of this case to another court at this point would contravene the goal of judicial economy. The final factor considers the common interests of all sovereigns in promoting substantive social policies. This factor falls in neither party's favor.

As four of the five Gestalt factors fall in favor of New Life and the reasonableness of exercising jurisdiction, the Court's exercise of specific jurisdiction in this case would not be fundamentally unfair. Thus, the reasonableness prong of the tripartite test further supports the exercise of jurisdiction over CSA. Consequently, New Life has met its burden of making a *prima facie* showing that all three prongs of the tripartite test are meet, therefore specific personal jurisdiction exists over CSA.

### B. Venue

Where jurisdiction in a civil action is based only on diversity of citizenship, venue is governed by 28 U.S.C. § 1391(a), which states that the action can only be brought in "(1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought." *See* 28 U.S.C. § 1391.

When venue is challenged on a motion to dismiss, the plaintiff has the burden to present sufficient facts showing venue is appropriate. *Cordis Corp.,* 599 F.2d at 1086. New Life argues that venue is appropriate pursuant to § 1391(a)(1) and (c) because CSA is subject to personal jurisdiction in this district. (Pl.'s Opp'n to Mot. to Dismiss at 13.) Alternatively, New Life asserts that jurisdiction exists pursuant to § 1391(a)(2) as CSA's "wrongful acts were directed into and have occurred into this district." (Compl.¶ 8.) New Life has set forth facts in the record showing that a "substantial part of the events or omissions giving rise to the claim" occurred in this district. *See* 28 U.S.C. § 1391(a)(2). According to the complaint, CSA directed communications to Maine in which it represented itself as an expert, failed to inform New Life of the appropriate coverage, and recommended or represented certain coverage as adequate for New Life when that coverage did not include "selling away" coverage. As these alleged facts constitute a substantial part of the events or omissions that give rise to New Life's claim, New Life has met the requirements of

§ 1391(a)(2) and therefore has established that venue in this district is proper. *Cf. U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.,* 241 F.3d 135, 153–54 (2nd Cir.2001) (finding venue proper in the New York court where the charter party giving rise to the plaintiff's claim was negotiated by nonforum defendant who directed communications to New York during the negotiation of the charter party) (citing *Bates v. C & S Adjusters, Inc.,* 980 F.2d 865, 868 (2nd Cir.1992)) (concluding that venue is proper as plaintiff's receipt of a collection notice within the district is a substantial part of the events giving rise to a claim under the claim); *Sacody Techs., Inc. v. Avant, Inc.,* 862 F.Supp. 1152, 1157 (S.D.N.Y.1994) (stating that § 1391(a)(2) may be "satisfied by a communication transmitted to or from the district in which the cause of action was filed, given a sufficient relationship between the communication and the cause of action."). Accordingly, I recommend that CSA's request for the Court to transfer this action to California be denied, as venue is proper in Maine.

### Conclusion

I recommend that the Court **DENY** the motion to dismiss as the Court has personal jurisdiction and venue is proper.

### *NOTICE*

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de*

*novo* review by the district court and to appeal the district court's order.

June 26, 2002.