**Mark LEVIN and Becky Levin, Plaintiff,**

**v.**

**Roger J. HARNED, d/b/a Roger Harned Designs, Dalva Brothers, Inc., Foster–Gwin, Inc., John J. Nelson Antiques, Ed Hardy Antiques, a/k/a Ed Hardy San Francisco, and Newel Art Galleries, Inc., Defendants.**

**No. CIV.A.01–11354–PBS.**

United States District Court, D. Massachusetts.

Sept. 17, 2003.

Anthony A. Scibelli, Brian E. Whiteley, Scibelli & Whiteley, LLP, Richard J. Innis,

---

Hale & Dorr, LLP, Boston, MA, for Plaintiff.

Philip M. Chiappone, McCanliss & Early, L.L.P, New York, NY, Robert D. Hillman, Deutsch, Williams, Brooks, DeRensis, Holland & Drachman, Scott McConchie, Thomas F. Maffei, Griesinger, Tighe & Maffei, LLP, Jonathan D. Friedmann, Rudolph Friedmann, LLP, D. Lloyd Macdonald, Gregory R. Youman, Kirkpatrick & Lockhart LLP, Timothy C. Blank, Dechert LLP, Christopher P. Litterio, Ruberto, Israel & Weiner, P.C., Boston, MA, James J. Ficenec, Titchell, Maltzman, Mark & Ohleyer, San Francisco, CA, David Paul Steiner, David Steiner & Associates, Los Angeles, CA, Mark R. Kook, Hartman & Craven LLP, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. *INTRODUCTION*

Plaintiffs, Mark and Becky Levin ("the Levins") assert fraud, breach of contract, negligence, unfair and deceptive trade practices, and other common law claims against six defendants: Roger J. Harned, d/b/a Roger Harned Designs ("Harned"); Dalva Brothers, Inc. ("Dalva"); Foster–Gwin, Inc. ("Foster"); John J. Nelson Antiques ("Nelson"); Ed Hardy Antiques, a/k/a Ed Hardy San Francisco ("Hardy"); and Newel Art Galleries ("Newel").

The Levins hired Harned as an interior designer for their homes in Boston, Massachusetts and Middletown, Rhode Island. The five other defendants are all antique dealers that sold antiques to decorate the Levin homes. Plaintiffs claim that they relied on the deceptive descriptions of the items provided to Harned by the antiques dealers, in spending nearly five million dollars. Each of the five antiques dealers filed separate motions to dismiss for lack of personal jurisdiction under Fed.R.Civ.P. 12(b)(2).

On September 11, 2002, Magistrate Judge Cohen issued a Report and Recommendation on Motions to Dismiss for Want of In Personam Jurisdiction ("Report and Recommendation"). Judge Cohen recommended that the Court allow the motions to dismiss for lack of personal jurisdiction filed by the five antiques dealers: Dalva, Hardy, Foster, Nelson, and Newel. The Court assumes familiarity with that opinion. The Court adopts fully the analysis of the magistrate judge concerning general jurisdiction, and will not repeat it here.

After a hearing, supplemental jurisdictional discovery, and review of the voluminous briefing, the Court adopts the Report and Recommendation with respect to Nelson and Newel, both of which had little or no knowledge that the purchasers of the antiques resided in Massachusetts, or that they would receive the allegedly fraudulent descriptions of the antiques in Massachusetts. Thus, they did not purposely avail themselves of the forum. However, the Court declines to adopt the Report and Recommendation with respect to Dalva, Foster, and Hardy, and **DENIES** the motion to dismiss.

### II. *FACTUAL BACKGROUND*

The following facts are gleaned from the allegations in the Amended Complaint construed "in the light most congenial to the plaintiff's jurisdictional claim." *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,* 142 F.3d 26, 34 (1st Cir.1998). The Court also considers the undisputed facts established during jurisdictional discovery. *Id.*

#### 1. *Antique Lovers.*

The Levins live in Boston and own a vacation home in Middletown, Rhode Island. They sought to furnish both homes with authentic and valuable antiques. The

Levins hired Harned, an interior designer, to recommend and purchase antiques for both homes. On October 23 and 24, 2000, Harned met with the Levins in Boston to discuss his recommendations as to furnishings. He presented the Levins with photographs and descriptions of various antique items he recommended that they purchase, which he had received from the defendant antique dealers. On October 31, 2000, the Levins wired $4.9 million to Harned to buy antiques.

### 2. *Dalva Brothers.*

Dalva Brothers is an antique dealer that specializes in fine 18th-century French furniture and art. It is a New York corporation with a principal place of business in New York City. When Harned met with the Levins in Boston in October 2000, he presented them with photographs and descriptions of several items from Dalva Brothers, including what was described as an "exceptionally rare" Regence grandfather's clock made in France during the 18th century with a purchase price of $550,000. None of the written or oral descriptions indicated that it had undergone a restoration of any kind. Allegedly, the clock is neither authentic nor valuable. Although the case may have originated in the 18th century, the clock was drastically restored in the mid–19th century and the fair market value of the clock is in the range of only a few thousand dollars.

Similarly, Harned showed the Levins photographs and descriptions of two commodes, worth $110,000 and $90,000, which failed to show that the items had undergone significant restorations. Allegedly, the commodes had been so recently and extensively restored that their value has been substantially decreased.

Relying on the misrepresentations conveyed during their meeting in Boston, the Levins told Harned in Boston to purchase all three items. On November 6, 2000,

Dalva Brothers provided three invoices to Harned acting on behalf of the Levins for the antiques. The items were picked up in New York by a Massachusetts-based trucking company and delivered to a Massachusetts warehouse in Avon, Massachusetts, before being sent to Middletown.

The Levins also purchased items from Dalva Brothers for their home in Boston. In February 1999, the Levins purchased a pair of vases, a marble table, and a majolica inkwell, totaling more than $100,000 with commissions, for the Levins' Boston home.

Dalva sold items to the Levins in 1997, 1999 and 2000, and received more than $765,000 from the 1999 and 2000 transactions. Dalva's files from as early as 1997 contain documents indicating that Dalva knew the Levins lived in Massachusetts, was aware that the Levins were the purchasers of the items sold, and that all of the items were shipped to Massachusetts. The 1997 delivery receipt states "Mr. & Mrs. Levin, Boylston Street, Boston, MA." Further, the 1999 and 2000 delivery documents received from a shipping company in Avon, Massachusetts, also name the Levins. Lastly, a check to Dalva in 2000 for payment of goods, names the Levins in the description heading of the document.

Dalva dealt in New York with Harned, an agent of the Levins, and not directly with the Levins. Harned, not Dalva, made the shipping arrangements with the Massachusetts shipper to the Commonwealth. Although Dalva gave Harned pictures and descriptions that it knew he would give to the Levins in Massachusetts, it never communicated directly with the Levins. The defendant made no direct in-forum contacts (via fax, telephone or mail) related to the allegedly fraudulent sale of antiques.

Dalva is not "authorized" to do business in Massachusetts, has no employees or agents in Massachusetts, owns no real or

personal property in the Commonwealth, does not advertise in any publications directed to residents of Massachusetts, and does not solicit business in Massachusetts.

### 3. *Foster–Gwin.*

Foster–Gwin is a California corporation, specializing in period furniture from Europe, with a principal place of business in San Francisco, California.

In February 1999, the Levins purchased several items from Foster–Gwin for their home in Boston totaling $600,000. The items included commodes, a secretary, and a mirror. With one exception, none of the written or oral descriptions indicated that these items had undergone a restoration of any kind. The items, which were purchased for the Levins by Harned, were shipped from California to Boston.

When Harned met with the Levins in Boston in October 2000, he presented them with photographs and descriptions of several items: an "extremely rare pair of Italian baroque period red painted credenza" for $365,000; an "Unusual Italian Empire Period Cream Painted Chaise lounge" for $44,000; and a "South German Baroque period blue-painted Commode" for $37,000. None of the written or oral descriptions from Foster–Gwin indicated that they were of recent manufacture or had undergone a restoration of any kind (except with respect to the feet of the blue commode). In reliance on these representations, the Levins purchased the goods from their home in Boston. Some of the items were delivered to Massachusetts prior to being delivered to Middletown.

Allegedly, the red painted credenzas are nothing more than assemblages of old wood from other sources and the fair market value is within a range of $4,000 to $8,000; the cream chaise is actually not from the early 19th century, as represented, but a modern 20th century piece of furniture with a value of less than $1,000;

and the blue-painted commode is not from the Baroque period but is a recycled artifact of the late 20th century with a range of $750 to $1,250. The Levins also claim that several of the items purchased for the Levins' home in Boston are not authentic or valuable, such as the alleged 18th century Sicilian commode.

Foster–Gwin sold antiques to the Levins in 1997, 1999, and 2000. Although Harned paid for the items with his own checks, Harned told Foster–Gwin that he was acting on behalf of Mark and Becky Levin. Foster–Gwin dealt only with Harned who arranged for the shipping of the furniture to Boston. As of February 1999, S. Collier Gwin, the President, knew that the items were being shipped to Harned's clients in Boston, and by October–November 2000, he knew that Harned's clients were named the Levins. Foster–Gwin understood that the clients were working on a house in Rhode Island, and that some of the items would be held in Boston for the house being worked on in Rhode Island. The 1999 and 2000 items, worth about $560,000, were purchased from Foster–Gwin and were shipped from California to Boston. The invoices for all items are addressed to Roger Harned in California, but many invoices have the notation "shipment to Boston; will hold until advised." When all reasonable inferences are drawn in favor of plaintiff's jurisdictional assertions, Foster–Gwin was aware it was sending the description of the antiques and the antiques themselves to Boston.

Foster–Gwin owns no property in Massachusetts, has no employees in the Commonwealth, and does not advertise in publications directed towards Massachusetts. However, it has placed advertisements in national magazines circulated in Massachusetts. It has no web site of its own, although it advertises on other websites, and has shipped no furniture to Massachusetts

residents. It has made only two small sales to Massachusetts residents in recent years, but it purchased items from an auctioneer in Cambridge in January 2000.

### 4. *Ed Hardy Antiques.*

Hardy is a California corporation, specializing in antique furnishings, with a principal place of business in San Francisco, California.

In February 1999 the Levins purchased more than $275,000 of items from Hardy for their Boston home. Hardy sold antiques to Harned, who informed the head of sales, Kendra Boutell, that he was purchasing items for the Levins in Boston.

In October 2000, the Levins, from their home in Boston, purchased several items from Hardy for their Middletown, Rhode Island home based on photographs and descriptions presented by Harned. The descriptions included: a "Pair of French Louis XV walnut bergeres ... mid–18th Century" for $34,826 and an "Italian Neoclassical ... Painted Two–Door Armoire ... circa 1780" for $43,500. The descriptions disclosed that there had been "restorations" to the pieces, but the age and value of the pieces were nonetheless misrepresented. For example, the French Louis XV walnut bergeres are late 20th century reproductions, with a fair market value of less than $2,000 and the Italian Neo-classical Painted Two–Door Armoire is made from old wood or recently refurbished, with a late 20th century paint scheme and is worth between $2,000 to $3,000. Harned again informed the head of sales at Hardy that he was purchasing antiques for the Levins, this time for their home in Rhode Island. It invoiced Harned at his California address, and delivered the items to a third-party shipper in California.

Hardy has no employees, office, bank account, or property in Massachusetts and does not advertise in publications specifically directed at Massachusetts. Hardy mailed catalogs to a designer in Massachusetts but has not engaged in any business with this designer in the last five years. It maintains a web-site and advertises in the San Francisco Antique Show catalog distributed nationally.

## III. *DISCUSSION*

### 1. *Long Arm Jurisdiction Under State Law*

The Levins assert specific personal jurisdiction over the defendants under the Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, § 3 (2000). Specifically, the plaintiffs rely on § 3(a) ("transacting any business in this commonwealth"), § 3(b) (contracting to supply things in the Commonwealth), and § 3(d) ("causing tortious injury by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed ... in this commonwealth").

Section § 3(a) has been construed broadly: "transacting any business" means any purposeful act directed to the forum state. *See Ealing Corp. v. Harrods Ltd.*, 790 F.2d 978, 982 (1st Cir.1986). Thus, the jurisdictional inquiry is largely a federal constitutional one because the Massachusetts courts construe section 3(a)'s "transacting business" requisite as extending jurisdiction to the horizons of the Due Process Clause of the Fourteenth Amendment. *See Daynard v. Ness*, 290 F.3d 42, 52 (1st Cir.2002); *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 767, 625 N.E.2d 549, 553–53 (1994) ("Although an isolated and minor transaction with a Massachusetts resident may be insufficient, generally the purposeful and successful solicitation of business from residents of the Commonwealth by a defendant or its agent, will

suffice to satisfy this requirement."); *Automatic Sprinkler Corp. of Am. v. Seneca Foods Corp.*, 361 Mass. 441, 443, 280 N.E.2d 423, 424 (1972) ("We see the function of the long arm statute as an assertion over the person to the limits allowed by the Constitution of the United States.").

### 2. *Due Process.*

Plaintiffs must demonstrate that the exercise of jurisdiction comports with the Due Process Clause of the Constitution. *See Mass. Sch. of Law,* 142 F.3d at 35 (1st Cir.1998). When the in-forum contacts fall short of being "continuous and systematic" so that the exercise of general jurisdiction would be unfair, those contacts may still support the exercise of specific jurisdiction if they are related to the cause of action. *See United States v. Swiss Am. Bank, Ltd.,* 274 F.3d 610, 623 (1st Cir.2001) (involving claim against a foreign banking concern for breach of contract, unjust enrichment and conversion). Specific personal jurisdiction can be asserted over a defendant only if: (1) the claim "directly relates to or arises from the defendant's contacts with the forum"; and (2) "the contacts constitute purposeful availment of the benefits and protections afforded by the forum's laws." *Id.* at 620–21. If these two requirements are met, then (3) the court must look at the "overall reasonableness of the exercise of jurisdiction in light of a variety of pertinent factors that touch upon the fundamental fairness of an exercise of jurisdiction." *Id.* at 621.

Reasonableness is determined by the so-called gestalt factors: (1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies. *See United Elec. Radio and Mach.*

*Workers of Am. v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1088 (1st Cir.1992). The reasonableness stage of the jurisdictional analysis evokes a sliding scale: "[T]he weaker the plaintiff's showings on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of relatedness and purposefulness." *Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 210 (1st Cir.1994). Moreover, a failure to demonstrate the necessary minimum contacts eliminates the need even to reach the issue of reasonableness: "[t]he Gestalt factors come into play only if the first two segments of the test for specific jurisdiction have been fulfilled." *163 Pleasant St.,* 960 F.2d at 1091 n. 11.

### 3. *Arises out of/ Relatedness.*

In determining whether a claim directly relates to or arises out of the defendant's contacts with the forum, the Court must identify the contacts. Plaintiffs identify the transmission of the written descriptions and pictures of the antiques into the forum and the shipping of the goods to residents of the forum. Defendants point to the fact that plaintiffs do not allege any related contacts with the forum like telephone calls, mail or physical presence. They also emphasize that the interior designer arranged the shipping.

The relatedness inquiry differs depending on the cause of action. The opinion of the United States Magistrate Judge focused primarily on the sufficiency of contacts for a breach of contract claim. *See Swiss Bank,* 274 F.3d at 621 (cautioning that a "contract" by itself cannot automatically establish minimum contacts). However, the issue is more complicated be-

cause the primary claim here is fraud, an intentional tort, that was directed at the forum. *See Mass. Sch. of Law,* 142 F.3d at 35 (explaining that if the cause of action is a tort claim, the court will customarily focus on causation: whether the plaintiff has established "cause in fact" (i.e., the injury would not have occurred "but for" the defendants' forum-state activity) and "legal cause" (i.e., the defendant's in-state conduct gave birth to the cause of action)). Indeed, the analysis of the adequacy of the contacts for "relatedness" purposes also turns on the nature of the tort, as will be seen below.

### A. *Calder*

The difficult issue is whether in the context of an intentional tort like fraud, the in-forum effects of extra-forum activities are sufficient to constitute minimum contacts. In *Calder v. Jones,* 465 U.S. 783, 789, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), the Supreme Court held that California could assert personal jurisdiction over newspapermen in a defamation action based on the "effects" in California of defendants' tortious Florida conduct "because intentional conduct in Florida was calculated to cause injury to respondent in California." *Id.* at 789–90, 104 S.Ct. 1482. It reasoned:

> [The] petitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at [the forum] ... And they knew that the brunt of that injury would be felt by respondent in the [forum] ... An individual injured in [the forum] need not go to the [non-resident's state] to seek redress from persons who, though remaining in [their state], knowingly cause the injury in [the forum].

The "effects" test was drawn from Section 37 of the *Restatement (Second) of Conflicts of Laws,* which provides:

> A state has power to exercise personal jurisdiction over an individual who causes effects in the state by an act done elsewhere with respect to any cause of action arising from these effects unless the nature of the effects and the individual's relationship to the state make the exercise of jurisdiction unreasonable.

Comment e states: "When the act was done with the intention of causing the particular effects in the state, the state is likely to have personal jurisdiction though the defendant had no other contact with the state. This will almost surely be so when the effect involves injury to person or damage to tangible property." *Id.* at 54, 57 (1988 revision).

The First Circuit has narrowly construed *Calder,* holding that "the 'effects' test is a gauge for purposeful availment and is to be applied only *after* the relatedness prong has already been satisfied." *Swiss Bank,* 274 F.3d at 623 (emphasis added). As a general matter, it has held that the in-forum effects of extra-forum activities "without more" fail to sustain an action in the forum court. *Id.* at 625, citing *Mass. Sch. of Law,* 142 F.3d at 36. The First Circuit distinguished *Calder* because the "actual tort or injury, not just its consequences, occurred within the forum." *Swiss Bank,* 274 F.3d at 624–25.

In a thoughtful dissent in *Swiss Bank,* Judge Lipez construed the Restatement "effects" test approved in *Calder* to include a relatedness element: "It permits a state to exercise effects-based jurisdiction only when the plaintiff's claims arise out of or relate to the in-forum effects of the defendant's acts." 274 F.3d at 630. Relying on *Restatement (Second) of Conflict of Laws,* § 37 cmt. e, Judge Lipez states, "Under *Calder,* in order for jurisdiction to be based *solely* on the in-forum effects of the defendant's activity, the plaintiff must show that the defendant acted 'for the very

purpose' of causing harmful effects in the forum." *Id.* at 632.

Numerous courts have upheld a court's exercise of personal jurisdiction over non-resident defendants with no direct contact with the forum when the intentional tort was individually targeted at the resident of the forum state, and the brunt of the harm was felt there. In *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1358 (11th Cir.2000), for example, the Eleventh Circuit upheld the exercise of jurisdiction over a claim of fraud against out-of-state defendants who had no direct contact whatsoever with the forum state because they chose to do business with the forum resident, received a benefit from that business, authorized an out-of-forum insurance broker to issue the allegedly fraudulent insurance policy binder to the forum residents, and received insurance commissions. In *Janmark, Inc. v. Reidy*, a case involving an intentional business tort of interference with prospective economic advantage, the Seventh Circuit stated that after *Calder*, "there can be no serious doubt ... that the state in which the victim of a tort suffers the injury may entertain a suit against the accused tortfeasor." 132 F.3d 1200, 1202 (7th Cir. 1997). While other circuits have questioned the Seventh Circuit's sweeping assertion in *Janmark, see e.g., Noonan v. Winston Co.*, 135 F.3d 85, 90–91 (1st Cir. 1998) (denying specific personal jurisdiction over defamation claim because plaintiff could not show that defendants acted with sufficient intent to cause injury in Massachusetts, i.e., intentionally directing an act, tortious or otherwise, toward the forum state); *Imo Indus., Inc. v. Kiekert AG*, 155 F.3d 254 (3d Cir.1998) (finding that the Seventh Circuit interpreted *Calder* too broadly and holding that personal jurisdiction was lacking in a business tort case, absent evidence that defendant expressly aimed its tortious conduct at forum state), intentional fraud directed at a plaintiff in a particular forum can suffice to submit a defendant to personal jurisdiction in the forum state. *See Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087–88 (9th Cir.2000) (concluding that "express aiming" encompasses wrongful conduct individually targeting a known forum resident, that this conduct was sufficient for purposeful availment, and that the relatedness requirement was met because the contacts constituting purposeful availment gave rise to the current action); *Metro. Life Ins. Co. v. Neaves*, 912 F.2d 1062, 1065 (9th Cir.1990) (holding that an out-of-forum resident could be haled into a forum on the basis of a fraudulent letter she sent outside the forum to an insurance company, stating that "[t]he critical factor was that in sending the letter, the defendant was 'purposely defrauding' the [plaintiff in the forum]"); *Guidry v. United States Tobacco Co. Inc.*, 188 F.3d 619, 630 (5th Cir.1999) (finding minimum contacts under *Calder* where tobacco-defendants made false misrepresentations of facts concerning tobacco products that it knew would have potentially devastating effects on in-forum resident); *Preferred RX, Inc. v. Am. Prescription Plan, Inc.*, 46 F.3d 535, 551 n. 9 (6th Cir.1995) (while resolving the issue of personal jurisdiction on procedural grounds, pointing out that, under *Calder*, the court had reservations with defendants' argument that the court lacked jurisdiction because the out-of-state defendants "targeted" the in-forum defendant and knew that the results of their conduct would cause injury to the in-forum defendant).

In a helpful opinion, the Third Circuit distilled the three principal findings of *Calder* as follows:

First, the defendant committed an intentional tort. Second, the forum was the focal point of the harm suffered by the plaintiff as a result of that tort. Third, the forum was the focal point of the

tortious activity in the sense that the tort was "expressly aimed" at the forum. Essential was a corollary finding that the defendants knew that the "brunt" of the injury caused by their tortious acts would be felt by the plaintiff in the forum.

*Imo,* 155 F.3d at 261. However, the Third Circuit cautioned, "The mere allegation that the plaintiff feels the effect of the defendant's tortious conduct in the forum because the plaintiff is located there is insufficient to satisfy *Calder.*" 155 F.3d at 263.

The First Circuit has not yet had the occasion to address directly allegations of a fraudulent misrepresentation, expressly aimed at a resident of the forum state that causes harm in the forum state.[1]

### B. *Stream of Commerce Cases.*

In the product liability area, the Supreme Court has held that a nonresident defendant may be subject to specific jurisdiction under a stream of commerce theory even if his actions giving rise to the suit occurred outside the forum state and he had no direct contact with the plaintiff. "The forum state does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its product into the stream of commerce with the expectation that it will be purchased by consumers in the forum State." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 298, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). "But the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into

court there." *Id.* at 297, 100 S.Ct. 559. *See Rodriguez v. Hughes Aircraft Co.,* 781 F.2d 9, 15 (1st Cir.1986) (in a product liability case, declining jurisdiction over the company selling two helicopters through out-of-forum bidder to Puerto Rico on the ground that the test was not "knowledge of the ultimate destination of the product but whether the manufacturer has purposefully engaged in forum activities so it can reasonably expect to be haled into court there"). In *Asahi Metal Ind. Co., Ltd. v. Superior Court of California, Solano County,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), Justice O'Connor, writing for three other justices, held:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. *Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.* But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Id.* at 1032 (emphasis supplied). Under this plurality view, a plaintiff is required to show "additional conduct" directed toward the forum before finding the exercise of jurisdiction over the defendant to be consistent with the Due Process Clause. *Id.*

---

1. *Massachusetts School of Law* involved claims of intentional torts but the "strand" that sewed the charges together was that de-

fendants banded together to monopolize education.

## C. *This Case.*

While this case presents difficult questions under the "relatedness" step of the due process analysis, plaintiffs have met their burden of establishing relatedness in at least two ways. First, although the antique dealers made allegedly fraudulent representations to plaintiff's agent Harned outside of the forum about the quality and value of certain antiques, they knew Harned would transmit the information to the Levins in Boston, that the plaintiffs would rely on the descriptions in Massachusetts in making the purchasing decision and that the brunt of the financial injury from the alleged fraud would be suffered in Massachusetts. The tort was completed in Massachusetts where the reliance occurred and it caused damages in Massachusetts. As in *Calder*, the actual tort and injury, not just the consequences, occurred within the forum. *Swiss Am. Bank*, 274 F.3d at 624–25 (holding that legal tort of conversion occurs where conversion takes place). *Compare Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 291 (1st Cir.1999) (finding no jurisdiction where the breach of fiduciary duty occurred outside the forum); *Mass. Sch. of Law*, 142 F.3d at 36 (citing cases where the forum effects of a tort committed out of state, like negligence, did not, without more, sustain jurisdiction in the forum). The fact that the dealers did not know the ultimate destination of the antiques (i.e., Boston or Middletown) is not dispositive.

Second, plaintiffs have established that defendants released the goods to a Massachusetts shipper, knowing that the antiques were to be shipped to Massachusetts. While defendants make much of the fact that the interior designer, not the antiques dealer, arranged for the shipping, this factor is not dispositive in a stream of commerce analysis. Although the stream of commerce caselaw is usually applied in the context of a claim of product liability,

one court has applied the stream of commerce analysis to a fraud claim. *See Ruiz de Molina*, 207 F.3d at 1357–58 (allowing personal jurisdiction over a fraudulent insurance claim under stream of commerce theory where out-of-forum defendants knew that the insurance was purchased by in-forum plaintiffs via an out-of-forum broker).

Under the post-*Asahi* stream of commerce cases, the Court may consider "additional conduct" in deciding whether the placement of a product into the stream of commerce is an act of the defendant purposely directed to the forum state. Here, the transmission of allegedly fraudulent statements to plaintiffs' interior designer knowing he would bring them into the forum to describe, market, and promote the antiques to forum residents constitutes the "additional conduct" necessary to support personal jurisdiction. This case is not simply a single, spontaneous fortuitous sale of a product out of state to the agent of a resident of the forum. Rather, defendants deliberately solicited the sales by a forum resident prior to shipment—at least with respect to the sales in 2000. This is sufficient to support personal jurisdiction under the stream of commerce theory.

### 4. *Purposeful Availment*

The purposeful availment test requires consideration of whether the defendant's contacts with the forum represent a purposeful availment of the privilege of conducting activities in the forum, thereby involving the benefits and protections of its laws in making the defendant's involuntary presence in the state courts foreseeable. *See Phillips Exeter Acad.*, 196 F.3d at 292.

This case fits neatly into the "expressly aiming" caselaw following *Calder*. The defendants allegedly committed an intentional tort, the forum was the focal point of the alleged harms suffered by plaintiffs, and

**230**

the alleged tort was expressly aimed at the forum. While the Court is constrained by *Swiss Am. Bank* from even considering the effects of the tortious conduct until after the relatedness prong has been established, this caselaw is directly relevant to "purposeful availment." When all reasonable inferences are drawn in favor of jurisdiction, defendants reasonably could be expected to be haled into court in Massachusetts because they knew that the ultimate purchasers were forum residents and that the antiques would be shipped to the forum either permanently or en route to Rhode Island.

### 5. *Gestalt–Factors*

Next, the Court must examine the "gestalt" factors to determine whether the exercise of personal jurisdiction offends "traditional notions of fair play and substantial justice." Plaintiffs' interest as consumers in obtaining relief in Massachusetts is strong, and their choice of forum is entitled to deference. None of the defendants has demonstrated any undue burden arising from being forced to litigate in Massachusetts. The state's interest in obtaining effective resolution of allegations of fraud in Massachusetts is compelling. I see nothing in the assertion of jurisdiction under the Massachusetts long-arm statute to offend due process.

### IV. *CONCLUSION*

The motion to dismiss Dalva Brothers, Foster–Gwin and Hardy is ***DENIED.***